## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| CLARUS THERAPEUTICS HOLDINGS, INC., *et al.*, | ) ) | Chapter 11 |
| | ) | Case No. 22-10845 (MFW) |
| Debtors. | ) | |
| | ) | (Jointly Administered) |
| GAVIN/SOLMONESE LLC, in its capacity as Plan Administrator under the Creditor Trust Agreement, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adv. Pro. No. 24- ____( ) |
| v. | ) | |
| | ) | |
| BLUE WATER SPONSOR, LLC, Y. JOSEPH HERNANDEZ, KIMBERLY MURPHY, JAMES SAPIRSTEIN, MICHAEL LERNER, YVONNE MCBURNEY, ELLENOFF GROSSMAN & SCHOLE, LLP, and MAXIM GROUP, LLC | ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR DAMAGES AND OBJECTION TO CLAIM

Gavin/Solmonese LLC in its capacity as Plan Administrator under the Creditor Trust Agreement [D.I. 392-1] (the "**Plan Administrator**") states its Complaint against Defendants as follows:

### Preliminary Statement

1.    The claims asserted in this action arise from breaches of fiduciary duties by Defendant Y. Joseph Hernandez regarding a business combination for which he was conflicted as a result of his roles as Chief Executive Officer and Board Chair of Blue Water Acquisition

Corporation ("**Blue Water**")[1] and his ownership and management of Blue Water's controlling shareholder, Blue Water Sponsor, LLC ("**Sponsor**").  Hernandez advocated for a Blue Water business combination based on his and Sponsor's interest, despite the clear signs that it would not be in the best interest of Blue Water.  Assisted by counsel and his financial advisor, Hernandez controlled the entire process surrounding the deal and controlled the flow of information to Blue Water's board of directors.  The Blue Water board was also conflicted as Defendants Y. Joseph Hernandez, Kimberly Murphy, James Sapirstein, Michael Lerner, and Yvonne McBurney each had an undisclosed material personal financial interest in closing on a business combination that diverged from the best interests of the company.  Nevertheless, they voted to approve the business combination promoted by Hernandez.  Far from being in Blue Water's best interest, that business combination was calamitous for the company.

2.       Blue Water's counsel, Defendant Ellenoff Grossman and Schole, LLP ("**Ellenoff**"), aided and abetted the breach of fiduciary duties by Sponsor and the Blue Water directors.  Ellenoff simultaneously represented both Blue Water's controlling shareholder, Sponsor, and Blue Water as Sponsor, acting through Hernandez, imposed its will on the company, favoring its own interests over the best interests of Blue Water.  Ellenoff was involved in every aspect of negotiating and documenting the deal and prepared materially misleading disclosures to the shareholders in connection with the transaction.

3.       Further, the breaches of fiduciary duties were also aided and abetted by Blue Water's financial advisor, the Maxim Group, LLC ("**Maxim Group**"), which had close ties to Defendant Hernandez.  Hernandez relied on Maxim Group in his evaluation of Clarus

---

[1] As part of the business combination at issue in this complaint, Blue Water changed its name to Clarus Therapeutics Holdings, Inc.

Therapeutics, Inc. ("**Clarus**"), and Maxim Group assisted Hernandez in an eleventh-hour resuscitation of the deal by securing the reversal of shareholder elections to redeem their shares. Throughout the process, despite being a close confidant of Hernandez and privy to unsettling information about the potential deal, Maxim Group did not share this material information with the other members of the Blue Water board. Maxim Group did all of this while suffering from its own conflict of interest, recognizing that a significant amount of fees owed to it were contingent on a closing of the transaction.

4.      Blue Water was formed as a special purpose acquisition company (a "**SPAC**")—a structure with a recognized proclivity for creating conflicts of interest on the part of controlling shareholders and directors. *See, e.g.*, *In re MultiPlan Corp. Stockholders Litig.*, 268 A.3d 784, 792 (Del. Ch. 2022) ("Many of the features that I consider in this opinion are common to SPACs, although some entities have more bespoke structures intended to address conflicts."); *Delman v. GigAcquisitions3, LLC,* 288 A.3d 692, 713-14 (Del. Ch. 2023) (holding "entire fairness standard of review applies due to inherent conflicts between the SPAC's fiduciaries and public stockholders in the context of a value-decreasing transaction").

5.      As typical for a SPAC, a sponsor formed Blue Water and purchased a significant percentage of the SPAC's stock (20%), 1,437,500 units, for a nominal amount, $25,000. This stock purchased by the sponsor is often referred to as the "**Founder Shares**."

6.      Through an initial public offering ("**IPO**"), Blue Water raised approximately $58 million from the sale of 5,750,000 units at $10 per unit.

7.      Blue Water's Charter allowed a specified period of time for Blue Water to identify and consummate a business combination with another company. If it failed to do so, the funds raised in its IPO (plus interest) would have to be refunded to the public shareholders. In

contrast, the Founder Shares and warrants purchased by Blue Water's sponsor would be worthless.

8.      Following the initial public offering, Blue Water purported to search for a privately owned company with which it could enter into a business combination transaction using the funds it had raised in the IPO.

9.      The search was conducted by Defendant Y. Joseph Hernandez, who was both: (a) managing member of Blue Water's sponsor and controlling shareholder, Sponsor, and (b) Chief Executive Officer and Chairman of the Board of Directors of Blue Water.

10.     Acting at what Hernandez described as, "warp speed," Hernandez chose a financially struggling, single-product pharmaceutical company, Clarus, for the business combination.

11.     Other than Hernandez, the Blue Water board of directors was not involved in the selection of Clarus as the target for Blue Water's business combination.  Nor was the board of directors engaged in evaluating any alternatives to a business combination with Clarus.

12.     No independent, non-conflicted person or entity provided a formal appraisal or assessment of the value of Clarus for Blue Water in connection with the business combination. Instead, Hernandez consulted with his friends at Maxim Group who provided cover for his failure to properly assess Clarus's value.

13.     And no independent, non-conflicted person or entity attempted to evaluate the business combination with Clarus to determine whether it was fair to Blue Water or in the best interests of Blue Water.

14.     Instead, Clarus was identified as an acquisition target by Defendant Hernandez, who was conflicted as a result of his ownership interest in, and control over, Sponsor.

15.     Ownership of the Founder Shares gave Sponsor interests that diverged from the best interests of Blue Water.  Although Sponsor would prefer a good deal over a bad one, Sponsor would be left empty handed if Blue Water did not enter into a business combination, since Sponsor's Founder Shares and private placement units would be worthless.  Therefore, Sponsor's interests were served by a bad deal versus no deal at all.  In contrast, Blue Water's interests would have been better served by completely passing on the Clarus combination.

16.     The disclosure of this conflict in the proxy statement sent to shareholders prior to the vote on the business combination was incomplete and woefully inadequate.  *See* Proxy Statement/Prospectus of Blue Water Acquisition Corp. ("Proxy Statement") at https://www.sec.gov/Archives/edgar/data/1817944/000121390021038392/f424b30721_bluewater.htm.  Although the Proxy Statement disclosed that Sponsor had a conflict, the Proxy Statement failed to disclose that each of Blue Water's directors, who approved the business combination with Clarus, owned an interest in Sponsor and therefore also had a conflict.

17.     Throughout the process of raising funds, identifying an acquisition target, and completing the business combination, Blue Water was represented by Ellenoff.  At the same time, Ellenoff was representing Sponsor.  Although the fact of Ellenoff's dual representation was mentioned in the attached Merger Agreement, the Proxy Statement failed to disclose the dual representation as a potential conflict.  Nor did the Proxy Statement disclose that Ellenoff needed a closing of a business combination to occur in order to collect its fees.

18.     With the material assistance of Ellenoff and Maxim Group, and ignoring their duties of loyalty and care including red flags in Claurs throughout the process, Hernandez and Sponsor pushed the business combination through an inactive and conflicted board and caused the deal to close despite the fact that private investment in public equity ("**PIPE**") financing had

completely failed to materialize and that on the eve of closing, Clarus was on the brink of bankruptcy.

19.     Also ignoring their duties of loyalty, the other Blue Water directors, Defendants Murphy, Sapirstein, Lerner, and McBurney, despite their conflicting interests, participated in the votes to approve the Merger Agreement and the closing of the business combination, unanimously approving both.

20.     The transaction was unfair to Blue Water in terms of process and price. Contributing to the unfairness of the process of the transaction, the Proxy Statement, which was primarily drafted by Ellenoff, omitted material information and contained misleading information relating to material facts.

21.     The business combination with Clarus was unfair in the price of the transaction as well.  Contrary to the advocacy of Hernandez, with the assistance of Maxim Group, Blue Water's investment of approximately $24 million in Clarus was completely unfair for Blue Water.  Clarus had never been profitable, had significant debt, and was on the brink of bankruptcy.

22.     Within a year of the closing of the business combination, Clarus had filed for bankruptcy and Blue Water's investment was completely lost.

**Bankruptcy Procedural Background**

23.     On September 5, 2022, Clarus Therapeutics Holdings, Inc. and Clarus Therapeutics, Inc., filed with this Court voluntary petitions under Chapter 11 of the Bankruptcy Code. [D.I. 1].

24.     On February 9, 2023, the First Amended Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Clarus Therapeutics Holdings, Inc. and Clarus Therapeutics,

Inc. [D.I. 270] (the "**Plan**") was approved by the entry of the Court's Findings of Fact and Conclusions of Law, and Order Approving and Confirming the First Amended Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Clarus Therapeutics Holdings, Inc. and Clarus Therapeutics, Inc. [D.I. 320] (the "**Confirmation Order**").  Among other things, the Confirmation Order approved the appointment of Gavin/Solmonese LLC as the Plan Administrator.  Confirmation Order at 12, ¶ 6.

<u>Parties</u>

25.     Pursuant to the terms of the Plan, the Confirmation Order, and the Creditor Trust Agreement, the Plan Administrator is authorized and has standing to prosecute the "Retained Causes of Action" (as that term is defined in the Plan).  The claims asserted in this Complaint are Retained Causes of Action.

26.     Defendant Blue Water Sponsor, LLC is a Delaware limited liability company that served as Blue Water's sponsor.  Sponsor's managing member was Y. Joseph Hernandez, and Defendants Hernandez, Lerner, Murphy, Sapirstein, and McBurney all held ownership interests in Sponsor.  For the nominal price of $25,000, Sponsor purchased 1,437,500 Founder Shares in Blue Water.  In addition, for $3,445,000, Sponsor purchased 3,445,000 placement warrants, each exercisable for one share of common stock at $11.50 per share.  Sponsor has been cancelled by the Delaware Secretary of State as of June 1, 2023 for failure to pay tax, and its registered agent resigned on February 19, 2024 without replacement.  Therefore, Sponsor may be served pursuant to Bankruptcy Rule 7004(3) by serving the Delaware Secretary of State pursuant to 6 Del. C. § 18-1107(f) and 6 Del. C. § 18-105(b) and by mailing a copy to its principal business address, which is 15 Putnam Avenue, Suite 363, Greenwich, Connecticut, 06830.

27.     Defendant Y. Joseph Hernandez is the managing member of Sponsor and former CEO and Chairman of the Blue Water Board of Directors. Mr. Hernandez may be served pursuant to Bankruptcy Rule 7004(b)(1) by first class mail to his dwelling house or usual place of abode at 5803 Southwest 36th Way, Gainesville, Florida, 32608.

28.     Defendant Michael Lerner is a former director of Blue Water and member of Sponsor.  Mr. Lerner may be served pursuant to Bankruptcy Rule 7004(b)(1) by first class mail to his dwelling house or usual place of abode at 5 Woodhill Road, Tenafly, New Jersey, 07670.

29.     Defendant Kimberly Murphy is a former director of Blue Water and member of Sponsor.  Ms. Murphy may be served pursuant to Bankruptcy Rule 7004(b)(1) by first class mail to her dwelling house or usual place of abode at 520 Carpenter Lane, Apt. 1F, Philadelphia, Pennsylvania, 19119.

30.     Defendant James Sapirstein is a former director of Blue Water and member of Sponsor.  Mr. Sapirstein may be served pursuant to Bankruptcy Rule 7004(b)(1) by first class mail to his dwelling house or usual place of abode at 5310 Boca Marina Circle, N. Boca Raton, Florida, 33487.

31.     Defendant Yvonne McBurney is a former director of Blue Water and member of Sponsor.  Ms. McBurney may be served pursuant to Bankruptcy Rule 7004(b)(1) by first class mail to her dwelling house or usual place of abode at 1372 Calle Luchetti, Apt. 300, San Juan, Puerto Rico, 00907.

32.     Defendant Ellenoff Grossman & Schole LLP is a law firm that holds itself out as having particular expertise in advising SPACs.  Its website states that since 2008, Ellenoff has been one of the leading U.S. law firms involved in SPACs, and that over the last decade, Ellenoff has been "the most active law firms [sic] in the SPAC program" as it has "worked on nearly 40%

of the SPACs during that time period," either as issuer's or underwriter's counsel.  *See* https://www.egsllp.com/practice-areas/spacs-and-alternative-public-offerings; https://www.egsllp.com/resources/spacs.  Pursuant to Bankruptcy Rule 7004(b)(3), it may be served by first class mail to the attention of an officer, a managing or general agent, or to any other agent authorized by appointment or law to receive service of process at its principal place of business at 1345 Avenue of The Americas, New York, New York, 10105.  Ellenoff represented Blue Water and Sponsor at all times prior to the closing of its business combination.

33.     Defendant Maxim Group, LLC is an investment banking firm that holds itself out as a "leading SPAC underwriter & advisor."  According to Maxim Group, since January 1, 2003, it has been involved with 230 of the 980 (approx. 23.5%) SPAC IPOs.  By an agreement with an effective date of April 27, 2021, Maxim Group became Blue Water's "financial advisor in connection with the proposed Business Combination."  Maxim Group letter dated April 27, 2021, ¶ 2.  Pursuant to Bankruptcy Rule 7004(b)(3), it may be served by first class mail to the attention of an officer, a managing or general agent, or to any other agent authorized by appointment or law to receive service of process at its principal place of business at 300 Park Avenue, 16th Floor, New York, New York, 10022.

## Jurisdiction and Venue

34.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.

35.     Venue is proper in the Court under 28 U.S.C. § 1409(a).

36.     The claims asserted in the Complaint are both core and non-core.

37.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b), as the matters complained of in the Complaint arise in and/or are related to the Chapter 11 cases pending before the Court, *In re Clarus Therapeutics Holdings, Inc.,* Jointly Administered, Case No. 22-10845 (MFW).

38.     Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Plaintiff consents to the entry of a final order by the Court in connection with this adversary proceeding to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.  The Plan Administrator, on behalf of Clarus Therapeutics Holdings, Inc. has consented and hereby consents to the adjudication of these claims in the Court.

**Statement of Facts Supporting Relief**

**I.      Background**

39.     Special Purpose Acquisition Companies tend to follow a formulaic structure that the Delaware Court of Chancery has recognized to be susceptible to potential conflicts of interest.  Blue Water is no different.

40.     Indeed, to represent Sponsor and Blue Water as counsel, Hernandez hired Ellenoff—a law firm that boasts on its website that it is one of the most active in the country in working with SPACs.

**A.      *Special Purpose Acquisition Companies***

41.     SPACs are shell companies (meaning that they have no day-to-day operations). SPACs are formed by a sponsor/management team for the purpose of raising capital in an initial public offering in anticipation of identifying an acquisition target and consummating a business combination.

42.     A sponsor entity typically incorporates the SPAC, bears the start-up costs, registers the SPAC with the Securities and Exchange Commission, and conducts the initial public offering.

43.     The SPAC's sponsor typically purchases shares of stock in the SPAC, often 20% of the SPACs stock, for a nominal price.  These shares are often referred to as Founder Shares.

44.     The sponsor may also purchase placement warrants that will entitle it to purchase stock for a set price in the future.

45.     Through its IPO, a SPAC will typically sell units for $10 per unit.  Purchasers of units in the IPO are often referred to as the public shareholders (in contrast with the owners of the founder shares).  Each unit consists of one share of common stock and a warrant (often a fractional warrant) that will allow for the purchase of a share of common stock for a set price, for example, $11.50 per share.

46.     The SPAC then engages in a search to find an acceptable acquisition target.  Once identified, the SPAC will negotiate and attempt to reach an agreement for a business combination.  The transaction through which the target company is acquired is frequently referred to as a "**deSPAC**" transaction.

47.     Money raised via the IPO from the public shareholders is required to be held in trust and may be used only if a target company is identified and acquired (*i.e.* only after consummation of the business combination).

48.     If the SPAC fails to acquire a target company within the time frame set forth in its Charter, usually twelve months with the ability to extend for an additional six months, the following will occur:

a.    The SPAC must be liquidated and all funds held in trust plus interest are returned to the public shareholders;

b.    The Founder Shares and placement warrants held by the sponsor become worthless; and

c.    Expenses incurred by the SPAC, including professional fees, may only be paid with funds not held in trust, which as a practical matter means that the sponsor and directors who make loans to the SPAC will not be repaid and professionals who worked for the SPAC will not be paid in full.

49.    Depending on the structure of the business combination, the SPAC's shareholders typically vote on whether to approve a business combination.  For any type of deSPAC transaction, the public shareholders have the option to redeem their stock for the price they paid plus interest.  But when a shareholder vote is held, the vote of a particular shareholder is not tied to the shareholder's decision whether or not to redeem.  In other words, a shareholder may vote to approve a business combination and still elect to redeem his or her stock.

50.    According to Ellenoff's website, a SPAC "provides public company transparency to investors with full disclosure and voting rights with respect to approving the proposed business combination."  *See* https://www.egsllp.com/practice-areas/spacs-and-alternative-public-offerings.

**B.    *Blue Water Followed the General SPAC Playbook***

51.    Blue Water was incorporated as a SPAC on May 22, 2020.  It was created by its sponsor/management team of Defendants Sponsor and Y. Joseph Hernandez.

52.    Defendants Hernandez and Sponsor created Blue Water and funded its start-up with, among other things, the purchase of Founder Shares and placement warrants.

53.     Specifically, Sponsor purchased 1,437,500 shares of Class B Common Stock (roughly 20% of the SPACs equity) for $25,000.  These Founder Shares would convert to Class A common stock upon closing of Blue Water's initial business combination and would be subject to a 180-day lock-up period from that date during which the stock could not be sold.

54.     Sponsor also purchased 3,445,000 placement warrants for $3,445,000, each warrant exercisable for one share of Class A Common Stock at $11.50 per share.

55.     Blue Water held its IPO on December 15, 2020, raising $57,500,000 through the sale of 5,750,000 units to public shareholders.  Each unit consisted of one share of Class A common stock and a warrant that allowed for the purchase of one additional share of stock at a price of $11.50 per share.

56.     Blue Water's Charter required the money raised from the public shareholders in the IPO to be held in trust until either the consummation of a business combination or the return of funds to the public shareholders.

57.     Blue Water's Charter provided that if Blue Water did not complete a business combination with a target company within an allotted time frame (twelve months with a potential extension to eighteen months), then the following would occur:

a.     Blue Water was required to distribute all funds held in trust to the public shareholders;

b.     The 1,437,500 Founder Shares and the 3,445,000 placement warrants owned by Sponsor, would be worthless; and

c.     Limited funds would be available to pay for Blue Water's expenses, including directors' expenses and professional fees.

58.     As discussed in more detail, *infra*, Blue Water entered into a merger agreement with Clarus and Blue Water held a shareholder meeting to approve the business combination on August 27, 2021 (referred to herein as the "**Business Combination**").  In addition to that vote, and regardless of whether a stockholder voted to approve the business combination or not, the Blue Water public shareholders had the right to redeem their shares for full value.

## II.    Blue Water's Sponsor, Board of Directors, Counsel, and Financial Advisor All Had Conflicts of Interest with Regard to the Business Combination

59.     Blue Water's Sponsor, board of directors, financial advisor, and counsel all had divided loyalties with regard to the Business Combination.

### A.    *Sponsor Had a Conflict of Interest with Regard to the Business Combination*

60.     Sponsor had a conflict of interest with regard to the Business Combination because it stood to receive a unique benefit that was not aligned with the best interests of the company, resulting from its ownership of Founder Shares.

61.     Sponsor faced significant economic loss if Blue Water did not consummate a business combination with an acquisition target because:

a.     The Founder Shares and private placement warrants it owned would be worthless;

b.     Sponsor would lose its entire investment in Blue Water—an aggregate of $3,470,000, comprised of the $25,000 purchase price for the Founder Shares and the $3,445,000 purchase price for the placement warrants; and

c.     Sponsor would also lose out on any unreimbursed expenses it advanced for the benefit of Blue Water.

62.     The Merger Agreement assumed a Blue Water share value of $10 per share. Based on that value, 1,437,500 Founder Shares would have an aggregate implied value of approximately $14.4 million.

63.     But even if the Business Combination were not well received by the market and the trading price of New Blue Water common stock were to fall as low as $2.41 per share, rendering the placement warrants worthless, the value of the Founder Shares would be equal to Sponsor's initial investment in Blue Water.

64.     Thus Sponsor was likely to be able to recoup its investments in Blue Water, or at least recapture part of its investment, even if the transaction were not in the best interests of the company and caused Blue Water's stock price to fall precipitously.

65.     In contrast, if a business combination were not completed by Blue Water, then the Founder Shares and the placement warrants owned by Sponsor would be worthless.  Sponsor would lose its entire investment and get nothing in return.

66.     As a result, Sponsor had more of an economic incentive to enter into a business combination with a riskier, weaker-performing or financially unstable business, or an entity lacking an established record of revenues or earnings.

### B.      Each of the Blue Water Directors Had a Conflict of Interest with Regard to the Business Combination

67.     All of the Blue Water directors had a similar personal financial interest in ensuring a business combination occurred, whether it was a good deal for the company or not.

68.     Hernandez was the sole managing member of Sponsor, which owned Founder Shares.

69.     In addition to Hernandez's control of Sponsor, he had a significant ownership interest in Sponsor as well, which gave him, in effect, the benefit of owning well over a million Founder Shares in Blue Water.  Using the $10 per share assumption of the Merger Agreement, Hernandez's interest in Sponsor would have an implied value of approximately $10,000,000.

70.    In February 2021, Sponsor, with the assistance of Ellenoff, granted membership interests to each of the other Blue Water directors.  The membership interests Sponsor transferred to each Blue Water director corresponded to 10,000 shares of common stock in Blue Water.  Using the $10 per share assumption of the Merger Agreement, each of these directors' interest in Sponsor would have an implied value of approximately $100,000.  Thus, each of the other directors, Kimberly Murphy, Michael Lerner, James Sapirstein, and Yvonne McBurney, also had a material personal financial interest in the Business Combination through their ownership interest in Sponsor.

71.    This ownership interest in Sponsor was the only form of compensation for these directors to serve on the Blue Water board.  Therefore, if Blue Water did not close on a business combination, Defendants Murphy, Sapirstein, Lerner, and McBurney would be paid nothing for being Blue Water directors.

72.    In addition to his personal financial interest through his ownership interest in Sponsor, Hernandez had an additional interest in the consummation of the Business Combination because he would remain as a director of the combined entity following the Business Combination and entitled to be paid for that role.

73.    Similarly, in addition to her personal financial interest through her ownership interest in Sponsor, Kimberly Murphy also had an additional interest in the consummation of the Business Combination as she planned to remain as a director of the combined entity following the Business Combination.

74.    Because the money Blue Water raised in the IPO was required to be held in trust until the consummation of a business combination, all directors were unlikely to be reimbursed

for their out-of-pocket expenses, unless Blue Water consummated an initial business combination.

### C.    *Ellenoff had Conflicts of Interest with Regard to the Business Combination*

75.    Ellenoff also had conflicts of interest with regard to the Business Combination. As a result of these conflicts, Ellenoff's interests were not aligned with the best interests of Blue Water.

76.    From its inception through the consummation of the Business Combination, Ellenoff represented Blue Water.  As counsel to Blue Water, Ellenoff occupied a position of trust with the company and its board of directors.  Among other things, Ellenoff advised Blue Water regarding confidentiality agreements with acquisition targets, the Clarus letter of intent and Merger Agreement, attempts to raise PIPE and other funding, filings with the Securities and Exchange Commission, the shareholder vote and redemption process, and all phases of corporate governance and the Business Combination.  As part of this, Ellenoff attended meetings of the BWAC SPAC Committee (discussed below) and the Blue Water board of directors.

77.    But throughout that same period of time, Blue Water also represented Sponsor. As detailed above, Sponsor had a significant economic interest in ensuring a business combination deal would close—any deal, even if it were a bad deal for Blue Water.  Thus with regard to the Business Combination, Ellenoff was tasked with serving clients with divergent interests.

78.    Ellenoff also had a significant financial self-interest in ensuring a business combination closed, even if it was a bad deal for the company.

79.    Only after the closing of a business combination, would cash raised in the IPO be released from the trust account and used to pay, *inter alia*, Blue Water's transaction expenses,

including professional fees.  Therefore, Ellenoff was unlikely to collect a significant portion of its legal fee unless Blue Water closed on the Business Combination.

80.     Further, Ellenoff had a contingent portion of its legal fee.  A portion of its fee was deferred until closing.  But if no closing occurred, this portion of the fee is only due to the extent the company has cash available to pay it.  Plus, if closing occurred, Ellenoff was entitled to a bonus payment.

### D.     *Maxim Group Had a Conflict of Interest with Regard to the Business Combination*

81.     Blue Water's financial advisor, Maxim Group, was owed over $2,000,000 in fees for serving as underwriter for the IPO that, as a practical matter, could only be paid if the Business Combination closed and the funds held in trust were released for use in paying Blue Water's expenses.

82.     This gave Maxim Group, with which Blue Water's management consulted as its financial advisor "in connection with its evaluation of Clarus," which purportedly included "a review of information on other publicly traded companies in the life sciences and healthcare industries," a strong self-interest in closing on a deal, even if that deal was not in the best interests of Blue Water.  *See* Proxy Statement at 118.

83.     As a result, Maxim Group did not advise the Blue Water directors that the Business Combination was not in the best interests of Blue Water—even though it clearly was not.  Nor did they advise that, at the very least, Blue Water ought to take time to identify other potential targets and seriously consider them.  Instead, along with Sponsor and Hernandez, Maxim Group knowingly assisted in creating an informational vacuum for the Blue Water directors regarding the value of Clarus.

84.    Thus, Sponsor, the directors, Blue Water's counsel, and Blue Water's financial advisor all had conflicts between what was best for them and what was best for Blue Water.

**III.    Sponsor Was a Controlling Shareholder Prior to the Business Combination**

85.    Prior to the Business Combination, Sponsor was the controlling shareholder of Blue Water under Delaware law.  Sponsor exercised actual control over the board and management of Blue Water.

86.    Sponsor, through its managing member, Defendant Hernandez, controlled Blue Water and its board by dominating the board's "corporate decision-making process" while it considered the Business Combination:

a.    Sponsor, through its managing member, Defendant Hernandez, conducted Blue Water's efforts to identify a target for acquisition; and

b.    Sponsor, again through its managing member, Hernandez, who was also the Chief Executive Officer and Chair of the board of Blue Water, controlled the information that was (and was not) provided to the Blue Water board of directors regarding Clarus and the Business Combination.

87.    Sponsor also controlled a majority of the board generally:

a.    Sponsor nominated the members of the Blue Water board;

b.    As owner of the Founder Shares, Sponsor had the right to elect all of Blue Water's directors prior to the Business Combination;

c.    Sponsor also had the right to remove a director of Blue Water as Blue Water's Charter provided that "prior to the closing of the initial Business Combination, the holders of [the Founder Shares] shall have the exclusive right to elect and remove, with or without cause, any director . . . ,"  December 16, 2020 Amended and

Restated Certificate of Incorporation of Blue Water Acquisition Corp., Article IX, § 9.9;

d.  Sponsor, through its managing member Hernandez, took actions without board knowledge or approval to identify potential acquisition targets and even made offers of letters of intent without input or approval from the board;

e.  The Blue Water directors were aware of Sponsor's control over the board as they would learn, after the fact, of actions and agreements that Sponsor, through Hernandez, had taken without board involvement, and Sponsor's power over the board and its composition was reflected in the Blue Water Certificate of Incorporation; and

f.  Despite the foregoing, the Blue Water board took no steps to neutralize Sponsor's control of the company or make Hernandez more accountable to the board.

## IV.  Joe Hernandez Moved at "Warp Speed" to Identify a Target Acquisition for Blue Water and Enter into a Letter of Intent

88.  The day after Blue Water's IPO, December 16, 2020, Joe Hernandez was introduced to Clarus.

89.  Hernandez was in a hurry and acted quickly and decisively; by December 24, 2020 he had told Dr. Robert Dudley, then President and CEO of Clarus, that he "wants to do this deal."

90.  Indeed, by December 24, 2020, Hernandez exclaimed that Clarus was "the" target.

91.  Hernandez signed a mutual confidentiality agreement with Clarus on behalf of Blue Water on December 28, 2020.

92.     And on January 7, 2020, apologizing for "[s]low lawyers," Hernandez informed Clarus that he hoped to have a letter of intent for a business combination "today or tomorrow."

93.     Hernandez provided the promised letter of intent and term sheet for a business combination with Clarus on January 12, 2021.  That term sheet, drafted by Ellenoff, provided for a total enterprise value of Clarus of $175 million.  Hernandez had neither informed nor obtained approval from the Blue Water directors for this letter of intent.

94.     Shortly after sending the term sheet to Clarus, Hernandez texted his Clarus point of contact to say, "Forgive the legal language bs.  Let me know if there is anything in there you want to discuss before that call [with the Clarus board].  But I am committed to getting to a deal."

95.     To the Clarus representative who received the foregoing text, it suggested a sense of desperation on the part of Hernandez.  Accordingly, the Clarus representative and a colleague called Hernandez that day, January 12, 2021.  In that call, Hernandez increased Blue Water's offer to a total enterprise value of $200 million, a $25 million increase.  Hernandez made this offer without conferring with the Blue Water directors.

96.     Hernandez provided Clarus with a revised letter of intent reflecting the increased price on or about January 20, 2021.

97.     Although McBurney, Lerner, Sapirstein, and Murphy were invited to join the Blue Water board by August 2020, they did not convene as a board until January 13, 2021, when they held an "Intro Call."

98.     Prior to the "Intro Call" the Blue Water board was provided "a target list of companies we have evaluated/are in discussions with . . . ."  That list identified 26 potential target companies and indicated that NDAs had been sent to 4 of them.  Other than a brief

discussion of the list, no potential acquisition targets other than Clarus were considered by the Blue Water board of directors.

99.     The Blue Water board next convened on January 27, 2021, to discuss a revised letter of intent from Clarus.  Clarus's revisions were to the January 19 letter drafted by Ellenoff (and sent by Hernandez to Clarus on January 20).

100.     By January 27, 2021, both Blue Water and Clarus had executed the letter of intent.  Although the letter of intent was "non-binding," it contained an exclusivity provision which provided that Blue Water and its representatives may not "solicit or initiate or enter into discussions, negotiations . . . concerning any Competing Transaction," which for Blue Water is defined as another business combination.

101.     This exclusivity provision limited the number of acquisition targets that Blue Water could consider.

102.     The January 27, 2021 letter of intent provides for a total enterprise value of Clarus of $203.125 million.

**V.     Hernandez Continues to Push for Closing a Transaction, Ignoring Warning Signs that a Business Combination with Clarus Was Not in Blue Water's Best Interests**

103.     After the letter of intent was signed, Hernandez continued to push towards the execution of a definitive merger agreement and closing of the Business Combination.  Hernandez maintained this singular focus despite warning signs regarding Clarus's financial status in due diligence and throughout the process.

104.     On February 9, 2021, Clarus's Chief Financial Officer, Steve Bourne, began to populate the data room for Blue Water's due diligence efforts.

105.     Ellenoff led the review of material Clarus provided in the data room and prepared reports for Blue Water summarizing and analyzing the information.

106.    A group was formed called the BWAC SPAC Committee, which consisted of members of the Clarus board and management, Hernandez, and Ellenoff lawyers.  This group met frequently and discussed every development in the Business Combination process.

107.    On February 4, 2021, Clarus executives met with the Blue Water board and provided a presentation regarding Clarus's business.

108.    At Hernandez's request, Blue Water provided projections based on the infusion of $50 million from the Business Combination.  This amount of money would have allowed for investments that Clarus hoped would lead to increased revenue.

109.    But even with these sanguine projections, the Clarus financials were concerning.

110.    Despite its poor track record, Hernandez was willing to go all in on Clarus, hoping that its current management would be able to turn things around with an infusion of funds.  But there were red flags signaling that was extremely unlikely.

111.    Clarus disclosed to Blue Water "substantial doubt about our ability to continue as a going concern."

112.    It had been roughly a year since Clarus's sole product, an oral testosterone replacement drug called JATENZO, earned approval from the U.S. Food and Drug Administration.  Clarus began marketing JATENZO in February 2020, but the company had never turned a profit.

113.    Clarus had a tremendous amount of debt, including a $50 million loan used for the JATENZO product launch.  Clarus disclosed, "We have incurred significant indebtedness in connection with our business and servicing our debt requires a significant amount of cash.  We may not have sufficient cash flow from our operations to satisfy the financial covenants in our debt agreements."  Proxy Statement at 34.

114.    In the three months ending March 31, 2021, Clarus had a net loss of $15,429,000. For the year ending December 31, 2020, its loss from operations was $47,177,000.  *See* Proxy Statement at 37.

A.      *Attempts to Secure PIPE Investment*

115.    During the due diligence period, the parties attempted to secure private investment in public equity investment.

116.    PIPE investors lined up to consider the Business Combination, and they all passed on it without investing.  Many explained their decision, offering negative feedback about Clarus and the Business Combination.

117.    By April 21, 2021, it was clear that the efforts to secure PIPE investment would be unsuccessful, and one of the companies hired to secure PIPE financing, BMO Capital Markets resigned as a result.  BMO explained to Clarus that they could not in good faith participate in a non-deal road show to tell investors this was a good opportunity.  Clarus relayed this comment to Hernandez and Ellenoff.

B.      *The Merger Agreement*

118.    Simultaneous with due diligence, counsel for the parties drafted the agreement to document the transaction.  This "**Merger Agreement**" sets out the structure of the Business Combination.  Blue Water and Blue Water Merger Sub Corp., a Delaware corporation and wholly owned subsidiary of Blue Water, consummated a reverse merger with Clarus.  Blue Water Merger Sub Corp. merged with and into Clarus with Clarus surviving as a wholly owned subsidiary of Blue Water, which then changed its name to Clarus Therapeutics Holdings, Inc.

119.    On February 18, 2021, Ellenoff returned a revised copy of the Merger Agreement. In it, Ellenoff added a provision on "Legal Representation."  In that section 12.16, Blue Water

purports to waive any actual or potential conflict arising from Ellenoff's representation of

Sponsor.

120.     The boards of Clarus and Blue Water met (separately) to approve the Merger

Agreement during the weekend of April 24, 2021.

121.     The Blue Water board of directors unanimously approved of the Merger

Agreement.

    a.     The Blue Water board did so without appointing an independent, disinterested

        special committee.

    b.     Nor did the Blue Water board engage a valuation specialist to evaluate Clarus and

        assess its value as an acquisition target.

    c.     Nor did the Blue Water board engage an independent expert to opine on the

        fairness of the Business Combination to Blue Water.

    ***C.***    ***On the eve of finalizing the Merger Agreement, Hernandez, Sponsor, Ellenoff, and Maxim Group assert their own interests at the expense of Blue Water's best interests.***

122.     On or about April 25, 2021, an issue arose regarding the correct number of

Founder Shares owned by Sponsor.  The letter of intent reflected a lower number than Hernandez

believed it should, and that lower number was being used in connection with the Merger

Agreement.

123.     In discussing this issue, Hernandez made clear to Clarus that the economic impact

of this discrepancy to him, personally, would be huge.

124.     To resolve this dispute, Hernandez suggested that 287,500 shares be added to

Sponsor's shares *and* that same amount be added to Clarus's side of the transaction.

125.    Hernandez's proposal, which was accepted by Clarus, had the effect of raising the "price" of the Business Combination for Blue Water by the value of those 287,500 shares.  Thus, Hernandez had, again, put his personal interest ahead of the best interest of Blue Water.

126.    In addition, on or about April 26, 2021, Ellenoff held up finalization of the Merger Agreement to insist upon clarification that Ellenoff was to be paid at closing expenses "that are not necessarily all transaction expenses for this deal."

127.    In a follow up email, an Ellenoff attorney explained, "Most of the SPAC's expenses, including banker fees and legal fees are deferred until closing and paid from the trust account . . . that is standard for every SPAC."

128.    At that time, Blue Water owed Ellenoff approximately $300,0000 in accrued and unpaid professional fees and expenses.

129.    Also in late April, Maxim Group complained that its right of first refusal to be engaged to solicit PIPE financing had been overlooked.  Maxim Group insisted on an additional fee and a modified engagement agreement to give it an interest in future investments secured by the combined entity.

130.    Maxim Group held up the signing of the Merger Agreement over this dispute.

**D.    *The Proxy Statement***

        ***1.    Preparation of the Proxy Statement***

131.    After execution of the Merger Agreement, Blue Water prepared for its shareholder vote on the Business Combination.

132.    Ellenoff took the lead on the Proxy Statement (S-4), preparing the initial draft on or about May 3, 2021.

133.    On May 9, 2021, Ellenoff circulated a revised draft Proxy Statement adding to the Q&As the following question and answer: "Did the Blue Water Board obtain a third-party

valuation or fairness opinion in determining whether or not to proceed with the Business

Combination?"  The answer provided: " . . . . In analyzing the Business Combination, the Blue

Water Board and Blue Water's management conducted due diligence on Clarus and researched

the industry in which Clarus operates and concluded that the Business Combination was in the

best interest of Blue Water's stockholders.  Accordingly, you will be relying solely on the

judgment of the Blue Water Board in valuing Clarus and assuming the risk that the Blue Water

Board may not have properly valued such business."  Proxy Statement at 12.

134.    On or about May 10, 2021, Ellenoff circulated a revised draft of the S-4, the

Summary of Risk Factors, which includes the following warnings:

a.      Some of the Blue Water's and Clarus's officers and directors may be argued to

have conflicts of interest that may influence them to support or approve the

Business Combination without regard to the shareholders' interests; and

b.      Blue Water did not seek an opinion from an unaffiliated third party as to the fair

market value of Clarus, or that the price it is paying for Clarus, is fair to its

shareholders from a financial point of view.

135.    On or about July 28, 2021, Blue Water mailed to its stockholders a definitive

Proxy Statement/Prospectus concerning the Business Combination.  The Proxy Statement

included the provisions referenced in paragraphs 133–34 above.  It informed the stockholders of

a special meeting to be held on August 12, 2021, at which stockholders would vote whether to

approve or disapprove of the Business Combination.  It also informed the stockholders that the

deadline to redeem their shares was August 10, 2021.

### 2.      *Failure to Disclose Directors' Ownership Interest in Sponsor*

136.    Although the Proxy Statement has a vague reference to the "Blue Water

management team" owning an interest in Sponsor, Proxy Statement at 49, it does not expressly

disclose that Defendant Hernandez is an owner of Sponsor.  It states that "the Blue Water management team, which owns interests in Sponsor, may have an economic incentive that differs from that of the public stockholders to pursue and consummate the Business Combination rather than to liquidate and to return all of the cash in the trust to the public stockholders." *Id.*  But the Proxy Statement never explains which of "the Blue Water management team" owns interests in Sponsor.  *See id.*  Elsewhere, the Proxy Statement distinguishes between the "Blue Water management team" and the Blue Water board of directors.  *See, e.g.*, *id.* at 110 (noting the "experience of Blue Water's management team and Board").  Indeed, the Proxy Statement expressly represents that "[o]ur board of directors has determined that Messrs. Lerner, Sapirstein and Ms. McBurney and Ms. Murphy are 'independent directors' as defined by Nasdaq listing standards and applicable SEC rules." *Id.* at 143.  Thus the Blue Water board of directors represented that these four directors did not have a relationship that "would interfere with the directors independent judgment in carrying out the responsibilities of a director."  *Id.*

137.    The Proxy Statement fails to disclose the ownership interest in Sponsor (and therefore, the economic interest in Blue Water Founder Shares) held by each of the Blue Water directors, Defendants Hernandez, Murphy, Sapirstein, Lerner, and McBurney.

138.    The Proxy Statement also fails to mention the significant influence over the other directors that Hernandez had at the time.  Each of the other Blue Water directors were obliged to Hernandez for appointment to the Blue Water board, the potentially lucrative grant of ownership interest in Sponsor, and the following, among other things:

     a.   In February 2021, Hernandez asked each of the other Blue Water directors, Defendants Murphy, Lerner, Sapirstein and McBurney, to be directors of

another SPAC, Blue Water Acquisition Corp. II, and each agreed to work with Hernandez on this company they referred to as "**SPAC II**"; and

b.  Along with Hernandez, Defendants Murphy and Sapirstein were both directors of another company controlled by Hernandez, Blue Water Vaccines, Inc.  ("**Blue Water Vaccines**").  Murphy held a significant number of options to purchase shares in the company.

139.    If light of the foregoing, the Proxy Statement's representation that Blue Water directors Sapirstein, Lerner, Murphy, and McBurney were "independent" was, at least, misleading.  *See* Proxy Statement at 143.

140.    The failure of the Proxy Statement to fully disclose all material facts, including the facts surrounding ownership of Sponsor, is particularly troublesome in this merger where the Blue Water stockholders were forced to "rely[] solely on the judgment of the Blue Water Board." Proxy Statement at 45.

### 3.  *Failure to Disclose Ellenoff's Dual Representation and Contingency Fee*

141.    The Proxy Statement does not disclose that Blue Water's counsel, Ellenoff, who authored the Proxy Statement, simultaneously represented Sponsor.

142.    Nor does the Proxy Statement disclose that Ellenoff had fees that would only be paid upon the closing of the Business Combination.  Nor does the Proxy Statement disclose that Ellenoff had a contingent bonus component to its fee.

### 4.  *Failure to Disclose the Extensive Relationship Between Hernandez and Maxim Group and Misleading Disclosure of Maxim Group's Fee*

143.    Effective as of April 27, 2021, Maxim Group entered into an amendment to the underwriting agreement dated December 15, 2020, in which it agreed to serve as Blue Water's "financial advisor in connection with the proposed Business Combination" in exchange for a

"fee of $250,000, in cash, upon the closing of such Business Combination."  Maxim Group

Letter dated April 27, 2021, ¶ 2.

144.    The Proxy Statement makes the following representations about Maxim Group in

relevant part:

> Maxim Group LLC ("Maxim") . . . . is entitled to $2,012,500 of
> deferred compensation for its underwriting services in connection
> with the Blue Water IPO. Other than disclosed herein, there has been
> no material relationship between Blue Water or its affiliates and
> Maxim Group and its affiliates or unaffiliated representatives during
> the past two years, nor is any such relationship contemplated.

Proxy Statement at 118–19.

145.    The statement that Maxim Group is entitled to over $2 million of "deferred

compensation" is materially misleading.  Maxim Group effectively had a contingency fee

because Blue Water would only be able to pay the fee if the Business Combination closed and

the funds from the IPO were released from the trust.  Such a fee structure is particularly

problematic in a deal like this one where, as Blue Water's financial advisor, Maxim Group

needed to advise the directors not to pursue the Business Combination.

146.    The statement that "there has been no material relationship" is also materially

misleading.  Hernandez had a material relationship with Maxim Group.

147.    Hernandez hired Maxim Group to underwrite an IPO for SPAC II on or about

February 2, 2021.  SPAC II filed a confidential draft registration statement with the SEC on or

about August 8, 2021, and on or about October 18, 2021, SPAC II filed its S-1 registration

statement with the SEC.  The S-1 discloses that Maxim Group was to serve as the underwriter

and as a result, would be paid over $2.5 million in fees.

148.    Hernandez had also recently engaged Maxim Group to assist another of his

companies, Blue Water Vaccines, Inc. with an IPO.  On or about June 10, 2021, on behalf of

Blue Water Vaccines, Hernandez approved the form of Maxim Group's engagement agreement. On or about August 23, 2021, Blue Water Vaccines filed a confidential draft registration statement with the SEC, and on or about October 10, 2021, Blue Water Vaccines filed its S-1 registration statement with the Securities and Exchange Commission.  Both the draft and the final version of the S-1 disclose that Maxim Group serves as the "Sole Book Running Manager."

149.    Both of these engagements were prior to the Proxy Statement and known to Ellenoff, which was also involved in these engagements, and Hernandez.

150.    Hernandez had an extremely close relationship with Maxim Group as a firm and in particular with Jim Alfaro, who was at that time a Senior Managing Director and Head of Investment Banking at Maxim Group.  Hernandez's relationship with Maxim Group and Alfaro was so strong that he wanted to help ensure that their relationship with Blue Water continued after the Business Combination.  In recommending Alfaro to Murphy, the incoming chair of the board of Clarus Therapeutics Holdings, Inc. after the deSPAC, Hernandez described him as "our banker," a "friend," an "old neighbor," and "one of the best Wall Street people you will meet."

151.    After the Business Combination, Hernandez continued to communicate behind the scenes on behalf of Maxim Group.  For example, when Maxim Group pitched Clarus Therapeutics Holdings, Inc. for an engagement for which Maxim Group was not hired, Alfaro sent an email to Hernandez about it.  Moments later, another senior investment banker from Maxim Group emailed certain executives at Clarus Therapeutics Holdings, Inc., including Hernandez, complaining that they did not get hired.  Hernandez responded only to the senior investment banker and his friend, Alfaro, stating that he "won't be happy" if "this was a work around."  But Hernandez told them that he had been "assured" that the deal had been in the works for some time.

152.    Hernandez's advocacy paid off.  On March 30, 2022, Hernandez implored that Clarus "move on" his request to hire Maxim Group.  Within a month, on April 27, 2022, Clarus Therapeutics Holdings, Inc. filed a Form 8-K disclosing that, on April 25, 2022, it had entered into an underwriting agreement with Maxim Group.

### E.    *Shareholder Vote and Redemption of Shares*

153.    The shareholder vote was originally scheduled for August 12, 2024, but it was postponed at the last minute because of discouraging information regarding the percentage of Blue Water stockholders electing to redeem their shares.

154.    Initially, almost all (90–95%) of the Blue Water public shares were redeemed. This placed the Business Combination in doubt because it meant that Blue Water would not satisfy a condition of closing.  Under the terms of the Merger Agreement, a condition of closing required that Blue Water not have shares redeemed in an amount that would cause it to have net tangible assets of less than $5,000,001 upon consummation of the merger.  Merger Agreement § 9.1(d) (attached to the Proxy Statement).

155.    The high redemption rate meant that Clarus would receive little if any cash in connection with the Business Combination.  Accordingly, Clarus's counsel prepared a termination agreement, sent it to Hernandez for his signature, and prepared to file for bankruptcy.

156.    Such redemptions posed a threat to the consummation of the Business Combination putting at risk, among other things, the Founder Shares and placement warrants owned by Sponsor, and in which Hernandez, Murphy, Sapirstein, Lerner, and McBurney held a pecuniary interest, as well as the outstanding, contingent fees of Ellenoff and Maxim Group at risk.  As a result, Hernandez requested that Maxim Group and Alfaro work to reverse the

redemptions.  Accordingly, Maxim Group assisted Blue Water's efforts to convince shareholders to change their decision regarding redemptions and enter into non-redemption agreements.

157.    In late August 2021, the stock price of Blue Water briefly spiked to over $30 per share, and Maxim Group and Hernandez were able to convince certain Blue Water shareholders to reverse their decision to redeem their shares.  This meant that Blue Water would meet the threshold amount of cash from the trust necessary to close the Business Combination.  As a result, the Blue Water shareholder meeting was rescheduled.

158.    In mid to late August 2021, Clarus had insufficient funds to continue its business, and its board of directors viewed bankruptcy as the company's only option if the Business Combination did not close.

159.    Through its close relationship with Hernandez and its involvement in attempts to rescue the Business Combination, Maxim Group and Alfaro learned negative information about Clarus's desperate financial situation.  Maxim Group should have informed Blue Water's directors of this negative information.  Instead, Maxim Group, Sponsor, and Hernandez continued to perpetuate the informational vacuum around the Blue Water directors.

160.    On August 27, 2021, 70% of the of shares entitled to vote were voted in favor of the Business Combination.

161.    And in connection with that special meeting, 3,270,531 Blue Water shares (56% of the public shares outstanding) were presented for redemption, leaving approximately $25.29 million in trust for the Business Combination.

### F.    *Blue Water Board Votes to Close on the Business Combination*

162.    Although Blue Water now had sufficient cash to close under the Merger Agreement, it was far from the transaction originally contemplated at the time the agreement was executed.  After paying fees and expenses associated with the Business Combination, Blue

Water provided less than half of the amount of cash initially contemplated.  And, as discussed *supra*, no additional funds had been raised though PIPE investment.

163.    Clarus had spent almost all of the additional investment provided by its own stockholders as part of the Business Combination just to make it to the date of closing.

164.    This meant that Clarus had not made the investments upon which its earlier projections had been based.

165.    It also meant that Clarus would not be able to make many of those investments going forward after the closing.  In the view of the Clarus board, closing on the Business Combination with Blue Water would simply allow Clarus to go public and live to fight another day.

166.    Clarus was on track to suffer a net loss of $40.6 million for FY 2021.

167.    Hernandez and Ellenoff sat in several meetings in which Clarus's fragile financial position was discussed and were aware of the facts discussed in paragraphs 163–66 above.  Yet Hernandez urged the Blue Water board to vote to approve of the closing and ratify the acts leading up to the Business Combination.  The Blue Water directors unanimously agreed to do so.

168.    The Business Combination closed on September 9, 2021.

## VI.    The Combined Entity Spirals into Bankruptcy

169.    Blue Water's post-merger performance confirms the unfairness of the Business Combination for Blue Water.

170.    After the deSPAC transaction, still in dire need of capital, Blue Water, now known as Clarus Therapeutics Holdings, Inc. (referred to herein as "**Holdings**" to indicate post-closing actions of Blue Water) appointed a special committee of independent and disinterested directors to consider a potential strategic transaction (something it did not do in connection with the deSPAC transaction when represented by Ellenoff).

171.    In April 2022, Holdings retained Raymond James as its investment banker. Holdings conducted a $30 million underwritten public offering of Holdings's common stock and accompanying warrants to purchase additional common stock.  But even this infusion of funds couldn't save the company.

172.    Holdings continued to lose money.  It suffered a net loss of $25.6 million for the six-month period ended June 30, 2022.  As of June 30, 2022, the company had an accumulated deficit of $347.2 million.  On August 18, 2022, Holdings announced that it would pursue an immediate reduction in staff and terminate certain research and development activities.

173.    Holdings filed for Chapter 11 protection in September 2022.  In connection with the bankruptcy, Holdings ran an in-court sale process.

174.    Through a section 363 sale, Holdings sold JATENZO, its sole commercial asset and only source of revenue, to Tolmar, Inc.  The sale price was $7.25 million cash, payment of cure costs, and the payment of contingent royalty payments over a three-year term, based on the net revenue generated from Tolmar's sales of JATENZO.  The sale closed on October 27, 2022.

175.    A bankruptcy plan establishing a liquidating trust for the pro rata benefit of unsecured creditors has been confirmed.  The creditors' trust retained causes of action, including claims regarding the Business Combination:

> The Estates are in the process of reviewing all aspects of this merger transaction, and expressly reserve all Retained Causes of Action against or related to any entity or person that participated in connection with such transactions, including all directors and officers of Clarus, Blue Water and the Merger Sub, any sponsors thereof and any entity or person who received anything of value in Merger Sub, any sponsors thereof and any entity or person who received anything of value in connection with or related to such transactions.  Without limitation, such claims may include, but are not limited to, direct, indirect and/or derivative claims for breaches of fiduciary duties, including without limitation the duties of care and loyalty, aiding and abetting such breaches, misrepresentation,

fraud, breach of contract, negligence, gross negligence, and unjust enrichment.

**Causes of Action**

**COUNT ONE: BREACH OF DUTY BY CONTROLLING SHAREHOLDER AGAINST DEFENDANT BLUE WATER SPONSOR LLC**

176.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1–175 above as if set forth in full herein.

*A.    Sponsor Is a Controlling Shareholder under Delaware Law*

177.    As described in paragraphs 85–86 above, Sponsor exercised actual control over the board and management of Blue Water.

178.    Under Delaware law, Sponsor was a controlling shareholder of Blue Water.

179.    The Delaware Chancery Court in *Delman* found that almost identical circumstances to those here established that a SPAC's sponsor is a controlling shareholder prior to closing of the initial acquisition.  288 A.3d at 716.  In *Delman*, as with Blue Water, the sponsor owned approximately 20% of the SPAC's stock, appointed the board, and its *owner* in *Delman* and *managing member* in Blue Water led the search for a target company.

180.    Sponsor acted through its managing member, Hernandez.  Hernandez was also the Chief Executive Officer and Chair of the Blue Water board of directors.  He influenced the Blue Water board of directors by, among other things, identifying the acquisition target by himself without involvement of the board; handling all negotiations with Clarus himself with only the assistance of Ellenoff, without involvement of other directors; controlling the information that was shared with the board; and advocating for consummation of the Business Combination with Blue Water.

### B.      Duty of Loyalty

181.     "The duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a . . . controlling shareholder and not shared by the stockholders generally." *In re Orchard Enters., Inc. Stockholder Litig.*, 88 A.3d 1, 33 (Del. Ch. 2014) (internal citations omitted).

182.     For the reasons discussed in paragraphs 60–66 above, Sponsor had a conflicting interest that was different from the other shareholders.  This conflict caused Sponsor to prefer a bad deal over no deal at all.  Sponsor would have been left empty handed if Blue Water did not enter into a business combination because under that scenario, the Founder Shares and private placement units would be worthless.

183.     Sponsor breached its fiduciary duties as controlling shareholder by prioritizing its own interests over the best interests of Blue Water and causing Blue Water to enter into the Merger Agreement and close on the Business Combination based on its own interests and despite the fact that the transaction was not in Blue Water's best interests.

184.     Sponsor unfairly imposed its will on Blue Water, acting through its managing member, Hernandez, and with the assistance of Ellenoff and Maxim Group.  Sponsor, among other things, identified the acquisition target and handled all negotiations with Blue Water without involvement of directors other than Hernandez.  Further, Sponsor controlled the information that was shared with the board and through Hernandez, to whom other members of the board were beholden, advocated for consummation of the Business Combination with Blue Water.  As a result, Sponsor caused the other directors to evaluate the Business Combination in a rushed and uninformed manner in which they could not consider all of the material information available.  Sponsor, motivated to close a Business Combination by its own self-interest, unfairly coerced a result that was not in the best interests of Blue Water.

185.    As a result of Sponsor's actions, the Blue Water board of directors did not undertake the thorough and careful process their duties to Blue Water required and approved of a business combination that was not in the best interest of Blue Water.

### C.    Entire Fairness Standard Applies

186.    Sponsor had a unique interest stemming from its ownership of Founder Shares. This type of unique interest was not shared with the other Blue Water shareholders.

187.    Because of the controlling influence of Sponsor, which was corrupted by the conflict caused by its unique interest, the Business Combination must be evaluated under the entire fairness standard.  And under that standard, the transaction fails.

188.    Under the entire fairness standard, the defendant fiduciaries will bear the burden "to demonstrate that the challenged act or transaction was entirely fair to the corporation and its stockholders."  *Delman*, 288 A.3d at 722 (citation omitted).

189.    "Although fairness has two component parts—price and process—the court must make a 'single judgment that considers each of these aspects.'"  *Id.* (citation omitted).

190.    First, as to process, the influence of Sponsor unfairly corrupted the entire decision-making process for Blue Water regarding the Business Combination.  Sponsor exerted this unfair influence in several ways, including the following:

  a.    As noted in paragraphs 183–85 above, Sponsor, through its managing member, Defendant Hernandez, controlled the Blue Water board of directors' deliberative process by limiting to Hernandez the identification of a target, the negotiation of a deal, and the subsequent meetings with Clarus aimed at closing the Business Combination.  Sponsor further exerted its control by limiting the information Hernandez and others provided to the board of directors for its consideration.

b.  Sponsor exerted control over the Blue Water board's decision-making process by granting an ownership interest to each of the directors.  As noted in paragraph 70, above, Sponsor granted an ownership interest to each of Defendants Murphy, Sapirstein, Lerner, and McBurney.  This grant ensured that these directors would also share a conflict of interest and incentivized them to vote as Sponsor desired.

c.  Further, the material misrepresentations and omissions in the Proxy Statement, noted in paragraphs 132–52, above, prevented the shareholder vote and redemption process from being an adequate check on the actions of a conflicted controlling shareholder and a conflicted board of directors.

191.    As for price, for the approximately $24 million that Blue Water paid Clarus through the reverse merger, Blue Water's stockholders obtained only between 18 to 30% of the shares in the new company.

192.    Blue Water used all of its cash, approximately $24 million, to buy a struggling company whose accountants expressed substantial concern about its ability to continue as a going concern, which had never turned a profit, and which at the time of closing of the Business Combination was on the brink of bankruptcy.  The price paid was unfair.

### D.   *Damages*

193.    As a result of the foregoing, Blue Water was harmed by an interested controlling shareholder placing its own self-interest ahead of Blue Water's best interest.

194.    Sponsor's breach of loyalty completely corrupted Blue Water's negotiation, agreement, and approval of the Business Combination.

195.    Blue Water suffered damages in an amount to be proved at trial.

196.    Plaintiff is entitled to rescissory damages.

197.    Plaintiff is entitled to such other damages as allowed by law.

**COUNT TWO: BREACH OF DUTY BY BLUE WATER DIRECTORS; AGAINST DEFENDANTS Y. JOSEPH HERNANDEZ, KIMBERLY MURPHY, JAMES SAPIRSTEIN, MICHAEL LERNER, AND YVONNE McBURNEY**

198.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1–175 above as if set forth in full herein.

199.    The Business and affairs of a Delaware corporation are managed by or under direction of its board of directors.

200.    In exercising these powers, directors are charged with an unyielding fiduciary duty to protect the interests of the corporation and to act in the best interests of its shareholders.

201.    Defendants Hernandez, Murphy, Sapirstein, Lerner, and McBurney all breached these duties they owed as directors of Blue Water.

202.    Corporate directors are not permitted to use their position of trust and confidence to further their private interests.

203.    Delaware law demands of a corporate director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his or her charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his or her skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers.

204.    The rule that requires an undivided and unselfish loyalty to the corporation demands that there be no conflict between duty and self-interest.

205.    In disclosing that the board did not seek a formal opinion from an unaffiliated third party as to the fair market value of Clarus or the price that Blue Water paid for Clarus, the Proxy Statement concedes: "Blue Water's stockholders will be relying solely on the judgment of

the Blue Water Board in determining the value of the Business Combination."  Proxy Statement at 45.

206.    The Blue Water board of directors' judgement was clouded.  The Blue Water board tacitly admitted its singular focus on consummating a business combination at any cost. Among the reasons listed in the Proxy Statement by the Blue Water board for its recommendation is a statement that Clarus is the best potential business combination "reasonably available to Blue Water," and that Blue Water had not identified a better alternative.  Proxy Statement at 28.  Absent from the explanation is consideration of no deal at all, which would clearly be preferable to the Business Combination here.

### A.    Directors' Breach of Duty

207.    Directors owe duties of loyalty and due care to the corporation they serve.  These duties include a duty of good faith.

208.    These duties required, *inter alia*, the Blue Water directors to place the interests of Blue Water above their personal interests and the interests of Sponsor.

209.    Each and every member of the Blue Water board of directors, Defendants Hernandez, Murphy, Sapirstein, Lerner, and McBurney, breached these duties when he or she voted to approve the Merger Agreement and again, when he or she approved the closing of the Business Combination and ratified all of Hernandez's actions leading up to the closing of the Business Combination as in the best interest of the company.

210.    "A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders" or "where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders."  *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993).

211.    As alleged in paragraphs 67–74 above, each of the Blue Water directors was conflicted with a material personal financial interest in the consummation of the Business Combination.

    a.  Hernandez controlled Sponsor as its managing member.  And he also had an ownership interest in Sponsor that corresponded to over 1,000,000 Founder Shares of Blue Water stock.

    b.  Each of the other directors, Defendants Murphy, Sapirstein, Lerner, and McBurney, also had an ownership interest in Sponsor that corresponded to ownership of 10,000 Founder Shares of Blue Water Stock.  Therefore, they also had a financial interest in the consummation of the Business Combination through Sponsor.

212.    Further, the other directors were not independent from Hernandez.  As alleged in paragraph 138 above, Blue Water directors Murphy, Sapirstein, Lerner, and McBurney were indebted to Hernandez for the appointment to the Blue Water board of directors, and they also relied on Hernandez for additional appointments and assistance.  These directors were well aware of Hernandez's significant financial interest in consummating a business combination (even if not in the best interests of Blue Water) and, as a result, their obligations to Hernandez impacted their independence.

213.    The foregoing interests of the Blue Water directors in the consummation of the Business Combination are sufficiently material to find that the directors were not independent.

214.    And the foregoing disloyalty infected all of the Blue Water board of directors' decisions with regard to the Business Combination.  There was not an independent majority of the board.

215.    Despite their divided loyalties, the Blue Water directors proceeded to vote on and approve every step of the Business Combination.  They failed to appoint an independent board committee to review and vote on the Business Combination, and they failed to engage a neutral third party to provide a formal valuation or fairness determination.

216.    Through the actions described above, the Blue Water directors breached their fiduciary duties by prioritizing their own personal, financial interests and approving the Business Combination with Clarus, which was unfair to Blue Water.

217.    Each of the Blue Water board members had a financial interest in ensuring the Business Combination occurred, whether it was a good deal for the company or not.

218.    Intertwined with their breach of loyalty, the directors also breached their duty of candor by issuing a false and misleading Proxy Statement.

219.    By providing inadequate disclosures about the Merger, the Defendants created an unfair process for shareholder approval of the Business Combination and redemptions.

220.    By failing to address known conflicts of interest—their own and those of fellow directors and the controlling shareholder—and failing to take measures to ensure board decisions would be in the best interest of Blue Water, each of the directors demonstrated a conscious disregard for his or her responsibilities.

221.    Through the actions described above, Defendants Hernandez, Murphy, Sapirstein, Lerner and McBurney breached their duties of loyalty, good faith, and due care.

### B.    *The Directors Are Not Insulated from Liability for Their Breach of Duty*

222.    Delaware corporate law does not allow for a waiver of the directors' duty of loyalty.  And it does not exempt SPAC mergers from the application of entire fairness review to enforce that obligation.

223.    Similarly, in the SPAC context in which a shareholder vote is separate from the shareholder's election to redeem shares, a shareholder vote will not cleanse decisions of a conflicted board of directors, even if the conflicts and all other material information were disclosed (which was not the case here).

224.    The business judgment rule presumption does not protect conduct by directors who have an interest in the challenged conduct or who lack independence from directors who have an interest in challenged conduct. "In such circumstances, a director cannot be expected to exercise his or her independent business judgment without being influenced by the . . . personal consequences resulting from the decision." *Rales,* 634 A.2d at 936. "[T]he law, sensitive to the weakness of human nature and alert to the ever-present inclination to rationalize as right that which is merely beneficial, will accord scant weight to the subjective judgment of an interested director concerning the fairness of transactions that benefit him." *Merritt v. Colonial Foods, Inc.*, 505 A.2d 757, 765 (Del. Ch. 1986).

225.    The Delaware Chancery Court has recognized the inherent conflicts of interest of directors with regard to deSPAC mergers. These decisions refuse to give directors the protection of the business judgment rule and instead apply Delaware's most exacting standard of review of director action: the entire fairness test.

### C.    *The Entire Fairness Standard Applies*

226.    Because there were not enough sufficiently informed, disinterested directors who acted in good faith while taking the actions described above to comprise a board majority, the standard of review of director action elevates to entire fairness.

227.    Under the entire fairness standard, the defendant fiduciaries will bear the burden "to demonstrate that the challenged act or transaction was entirely fair to the corporation and its stockholders." *Delman*, 288 A.3d at 722 (citation omitted). "Although fairness has two

component parts—price and process—the court must make a 'single judgment that considers each of these aspects.'" *Id.*

228.    First, as to process, the influence of Sponsor over the entire process, the interest of the Blue Water directors, and the failure to disclose those interests and other material facts in the Proxy Statement demonstrate a broken process that failed to achieve fairness.

229.    As for price, for the approximately $24 million that Blue Water paid Clarus through the reverse merger, Blue Water's stockholders obtained only between 18 to 30% of the shares in the new company.

230.    Blue Water used all of its cash, approximately $24 million, to buy a struggling company whose accountants expressed substantial concern about its ability to continue as a going concern, which had never turned a profit, and which at the time of closing of the Business Combination was on the brink of bankruptcy.

231.    The price paid was unfair to Blue Water.

### D.    *Damages*

232.    As a result, Blue Water was harmed by being deprived of loyal directors who prioritize the company's interest over their own and who fairly and accurately disclose information material to matters for which a shareholder vote is held.

233.    The directors' breach of duties completely corrupted Blue Water's negotiation, agreement, and approval of the Business Combination.

234.    Blue Water suffered damages in an amount to be proved at trial.

235.    Plaintiff is entitled to rescissory damages.

236.    Plaintiff is entitled to such other damages as allowed by law.

237.    The Blue Water directors, Defendants Hernandez, Lerner, Sapirstein, Murphy, and McBurney are jointly and severally liable for damages arising from the foregoing breaches of duties.

### COUNT THREE: AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES: AGAINST DEFENDANT ELLENOFF GROSSMAN & SCHOLE, LLP

238.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1–237 above as if set forth in full herein.

239.    Under Delaware law, a defendant is liable for aiding and abetting a breach of fiduciary duty where plaintiff establishes: (1) the existence of a fiduciary relationship; (2) proof that the fiduciary breached its duty; (3) proof that a defendant knowingly participated in a breach; and (4) a showing that damages to the plaintiff resulted from the concerted action of the fiduciary and the non-fiduciary.

240.    As alleged above, Sponsor and each of the Blue Water directors owed fiduciary duties to Blue Water.

241.    And, also as alleged above, Sponsor and the Blue Water directors breached their duties owed to Blue Water.

242.    Ellenoff, as counsel for Blue Water occupied a position of trust with the Blue Water board.

243.    Ellenoff, as counsel for Sponsor occupied a position of trust with it.

244.    Ellenoff acted with the knowledge that the conduct of Sponsor and the Blue Water directors constituted such a breach.  Among other things, Ellenoff:

      a.   served as counsel to both Blue Water and Sponsor;

      b.   Drafted and participated in the negotiations concerning all of the documents and agreements relating to the Business Combination;

    c.   Participated in Blue Water board of directors meetings; and

    d.   Participated in meetings with Clarus in which issues relating to the Business Combination were discussed, such as the failure to attract PIPE investment, Clarus's need for additional cash prior to the closing of the Business Combination, and Clarus's tenuous financial condition.

245.    Ellenoff materially participated in Hernandez and Sponsor's conflicted discharge of their fiduciary duties.

246.    Ellenoff materially participated in the Blue Water directors' conflicted discharge of their fiduciary duties.

247.    Further, Ellenoff participated in the decisions of Sponsor and the Blue Water directors and caused the Blue Water board of directors to make the decisions at issue.

248.    Ellenoff knew that the conduct of Sponsor and Blue Water directors constituted a breach of duty and gave substantial assistance and encouragement to the directors to breach their duties.

249.    As a result of the breaches of fiduciary duties alleged above, and Ellenoff's aiding and abetting those breaches, Blue Water was harmed by having a controlling shareholder impose its will on the company for the benefit of the controlling shareholder and to the detriment of the best interests of Blue Water.

250.    As a result of the breaches of fiduciary duties alleged above, and Ellenoff's aiding and abetting those breaches, Blue Water was harmed by being deprived of loyal directors who prioritize the company's interest over their own and who fairly and accurately disclose information material to matters for which a shareholder vote is held.

251.    The foregoing breaches of loyalty, and Ellenoff's aiding and abetting those breaches, completely corrupted Blue Water's negotiation, agreement, and approval of the Business Combination.

252.    Blue Water suffered damages in an amount to be proved at trial.

253.    Plaintiff is entitled to rescissory damages.

254.    Plaintiff is entitled to such other damages as allowed by law.

255.    Ellenoff is jointly and severally liable with Sponsor, the Blue Water directors, and Maxim Group for damages arising from the foregoing breaches of duties.

### COUNT FOUR: AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES: AGAINST DEFENDANT MAXIM GROUP, LLC

256.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1–237 above as if set forth in full herein.

257.    Under Delaware law, a defendant is liable for aiding and abetting a breach of fiduciary duty where plaintiff establishes: (1) the existence of a fiduciary relationship; (2) proof that the fiduciary breached its duty; (3) proof that a defendant knowingly participated in a breach; and (4) a showing that damages to the plaintiff resulted from the concerted action of the fiduciary and the non-fiduciary.

258.    As alleged above, Sponsor and each of the Blue Water directors owed fiduciary duties to Blue Water.

259.    And, also as alleged above, Sponsor and the Blue Water directors breached their duties owed to Blue Water.

260.    Because of its close relationship with Hernandez and role as financial advisor to Blue Water regarding the Business Combination, Maxim Group acted with the knowledge that the conduct of Sponsor and the Blue Water directors constitutes such a breach.

261.    Further, Maxim Group participated in the decisions of Sponsor and the Blue Water directors.  Maxim Group, as financial advisor for the Business Combination and as the Blue Water advisor with whom management consulted regarding its evaluation of Clarus, occupied a position of trust with Sponsor and the Blue Water board.

262.    Maxim Group materially participated in Hernandez and Sponsor's conflicted discharge of their fiduciary duties by serving as financial advisor and consulting with Hernandez and management on their evaluation of Clarus.  Further, Maxim Group was involved in the board's deliberations, and its failure to provide material information regarding the poor financial condition of Clarus to the full board of directors created an information vacuum that caused the Business Combination to proceed.

263.    Maxim Group knew that the conduct of Sponsor and Blue Water directors constituted a breach of duty and gave substantial assistance and encouragement to the directors to breach their duties.

264.    As a result of the breaches of fiduciary duties alleged above, and Maxim Group's aiding and abetting those breaches, Blue Water was harmed by having a controlling shareholder impose its will on the company for the benefit of the controlling shareholder and to the detriment of the best interests of Blue Water.

265.    As a result of the breaches of fiduciary duties alleged above, and Maxim Group's aiding and abetting those breaches, Blue Water was harmed by being deprived of loyal directors who prioritize the company's interest over their own and who fairly and accurately disclose information material to matters for which a shareholder vote is held.

266.    The foregoing breaches of fiduciary duties, and Maxim Group's aiding and abetting those breaches, completely corrupted Blue Water's negotiation, agreement, and approval of the Business Combination.

267.    Blue Water suffered damages in an amount to be proved at trial.

268.    Plaintiff is entitled to rescissory damages.

269.    Plaintiff is entitled to such other damages as allowed by law.

270.    Maxim Group is jointly and severally liable with Sponsor, the Blue Water directors, and Ellenoff for damages arising from the foregoing breaches of duties.

**COUNT FIVE: OBJECTION TO THE PROOF OF CLAIM OF KIMBERLY MURPHY**

271.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1–237 above as if set forth in full herein.

272.    Kimberly Murphy filed a proof of claim asserting an "unliquidated" claim based on purported "Contractual and Statutory Indemnity Rights as a Director of Clarus Therapeutics Holdings, Inc." against Clarus Therapeutics Holdings, Inc.  Claim No. 41.

273.    Nowhere in the proof, however, does it state the basis for her purported "contractual" indemnity rights.  As such, this objection will address Murphy's purported statutory indemnity rights as a director.

274.    Under Delaware law, to the extent that a director is sued based on a company-owned claim, as Murphy is here, the director is entitled to indemnification if, and only if, among other things, such director, "acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation."  8 Del. C. § 145(b).

275.    As alleged above, Murphy neither "acted in good faith" or "in a manner" she "reasonably believed to be in or not opposed to the best interests of" Clarus Therapeutics Holdings, Inc.

276.    Accordingly, given that Murphy is not entitled to indemnification under Delaware law, her claim should be disallowed pursuant to 11 U.S.C. § 502(b)(1).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment and relief in its favor and against Defendants, as follows:

A.    Finding that Sponsor is liable for breaching its fiduciary duties owed to Blue Water in its capacity as controlling shareholder of Blue Water;

B.    Finding Defendants Hernandez, Murphy, Sapirstein, Lerner, and McBurney liable for breaching their fiduciary duties owed to Blue Water;

C.    Finding Defendant Ellenoff liable for aiding and abetting the foregoing breaches of duties;

D.    Finding Defendant Maxim Group liable for aiding and abetting the foregoing breaches of duties;

E.    Awarding Plaintiff rescissory damages and all other appropriate damages;

F.    Awarding Plaintiff damages in an amount that may be proved at trial;

G.    Awarding Plaintiff pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees and other costs;

H.    Disallowing Murphy's claim in its entirety; and

I.    Awarding Plaintiff such other relief as the Court deems just and equitable.

Date: September 3, 2024
Wilmington, Delaware

MERCER LAW LLC
Robert M.D. Mercer
Georgia Bar No. 502317
(admitted *pro hac vice*)
3400 Peachtree Road, N.E.
Suite 1607
Atlanta, GA 30326
Telephone: (404) 975-3921
r.mercer@mercerlawllc.com
*Attorney to the Plan Administrator*

BONDURANT, MIXSON & ELMORE, LLP
David G.H. Brackett
Georgia Bar No. 068353
(admitted *pro hac vice*)
Solesse L. Altman
Georgia Bar No. 442827
(admitted *pro hac vice*)
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, GA 30309
Telephone: (404) 881-4100
brackett@bmelaw.com
*Attorney to the Plan Administrator*

GELLERT SEITZ BUSENKELL &
BROWN, LLC

*/s/ Michael Busenkell*
Michael Busenkell (DE 3933)
1201 N. Orange St., Ste. 300
Wilmington, Delaware 19801
Telephone: (302) 425-5800
Facsimile: (302) 425-5814
mbusenkell@gsbblaw.com
*Attorney to the Plan Administrator*