**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>CLARUS THERAPEUTICS HOLDINGS, INC., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 22-10845 (MFW)<br><br>(Jointly Administered) |
| GAVIN/SOLOMONESE LLC, in its capacity as Plan Administrator under the Creditor Trust Agreement,<br><br>Plaintiff,<br><br>v.<br><br>BLUE WATER SPONSOR, LLC, Y. JOSEPH HERNANDEZ, KIMBERLY MURPHY, JAMES SAPIRSTEIN, MICHAEL LERNER, YVONNE MCBURNEY, ELLENOFF GROSSMAN & SCHOLE, LLP, and MAXIM GROUP, LLC<br><br>Defendants. | Adv. Pro. No. 24-50125 (MFW) |

**DEFENDANT ELLENOFF GROSSMAN & SCHOLE LLP**
**ANSWER TO THE FIRST AMENDED COMPLAINT**

Defendant Ellenoff Grossman & Schole LLP ("EGS" or "Defendant"), by and through its undersigned counsel, hereby submits this Answer and Affirmative Defenses to the First Amended Complaint for Damages and Objection to Claim (the "Complaint") by Gavin/Solomonese LLC in its capacity as the plan administrator under the Creditor Trust Agreement [D.I. 392-1] (the "Plan Administrator") on January 15, 2025 [Docket No. 53] and respectfully represents as follows:

**Preliminary Statement**

1. The claims asserted in this action arise from breaches of fiduciary duties by Defendant Y. Joseph Hernandez regarding a business combination for which he was conflicted as a result of his roles as Chief Executive Officer and Board Chair of Blue Water Acquisition Corporation ("**Blue Water**") and his ownership and management of Blue Water's controlling shareholder, Blue Water Sponsor, LLC ("Sponsor"). Hernandez advocated for a Blue Water business combination based on his and Sponsor's interest, despite the clear signs that it would not be in the best interest of Blue Water. Assisted by counsel and his financial advisor, Hernandez controlled the entire process surrounding the deal and controlled the flow of information to Blue Water's board of directors. The Blue Water board was also conflicted as Defendants Y. Joseph Hernandez, Kimberly Murphy, James Sapirstein, Michael Lerner, and Yvonne McBurney each had a material personal financial interest in closing on a business combination that diverged from the best interests of the company. Nevertheless, they voted to approve the business combination promoted by Hernandez. Far from being in Blue Water's best interest, that business combination was calamitous for the company.

**Answer:** Paragraph 1 states conclusions of law to which no response is required. To the extent that a response is required, EGS denies the allegations in Paragraph 1.

2. Blue Water's counsel, Defendant Ellenoff Grossman and Schole, LLP ("**Ellenoff**"), aided and abetted the breach of fiduciary duties by Sponsor and the Blue Water directors. Ellenoff had knowledge of the breach of fiduciary duties because it simultaneously represented both Blue Water and its controlling shareholder, Sponsor, as Sponsor, acting through Hernandez, imposed its will on the company, favoring its own interests over the best interests of Blue Water; and Ellenoff documented the transfer of interest in the Sponsor to Blue Water directors Murphy, Lerner, Sapirstein, and McBurney, that compromised their

independence in assessing the business combination. Ellenoff participated in the breach of fiduciary duties through its involvement in every aspect of negotiating and documenting the deal, preparing materially misleading disclosures to the shareholders in connection with the transaction, and substantially assisting Hernandez in limiting the information that was shared with the Board. Throughout this process, Ellenoff had a strong financial incentive to ensure the closing of a business combination as payment to Ellenoff of over $1 million in fees depended on a closing.

**__Answer:__** EGS denies the allegations in Paragraph 2.

3. Further, the breaches of fiduciary duties were also aided and abetted by Blue Water's financial advisor, Maxim Group, LLC ("**Maxim Group**"). Maxim Group had knowledge of the breach of fiduciary duties as a result of, among other things its close ties to Defendant Hernandez and its role as underwriter and financial advisor to Blue Water. Maxim Group substantially assisted Hernandez in his evaluation of Clarus Therapeutics, Inc. ("Clarus"), and Maxim Group substantially assisted Hernandez in an eleventh-hour resuscitation of the deal by securing the reversal of shareholder elections to redeem their shares. Throughout the process, despite being a close confidant of Hernandez and privy to unsettling information about the potential deal, Maxim Group did not share this material information with the other members of the Blue Water board. Maxim Group did all of this while suffering from its own conflict of interest, recognizing that a significant amount of fees owed to it were contingent on a closing of the transaction.

**__Answer:__** EGS denies the allegations in Paragraph 3. EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 3 regarding communications between Hernandez and Maxim, and therefore denies same.

4. Blue Water was formed as a special purpose acquisition company (a "**SPAC**")—a structure with a recognized proclivity for creating conflicts of interest on the part of controlling shareholders and directors. *See, e.g.*, *In re MultiPlan Corp. Stockholders Litig.*, 268 A.3d 784, 792 (Del. Ch. 2022) ("Many of the features that I consider in this opinion are common to SPACs, although some entities have more bespoke structures intended to address conflicts."); *Delman v. GigAcquisitions3, LLC,* 288 A.3d 692, 713-14 (Del. Ch. 2023) (holding "entire fairness standard of review applies due to inherent conflicts between the SPAC's fiduciaries and public stockholders in the context of a value-decreasing transaction").

**Answer:** Paragraph 4 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 4, except EGS admits that Blue Water was a special purpose acquisition company.

5. As typical for a SPAC, a sponsor formed Blue Water and purchased a significant percentage of the SPAC's stock (20%), 1,437,500 units, for a nominal amount, $25,000. This stock purchased by the sponsor is often referred to as the "**Founder Shares**."

**Answer:** EGS denies the allegations in Paragraph 5 except admits that the Sponsor purchased 1,437,500 shares of the Company's Class B common stock.

6. Through an initial public offering ("**IPO**"), Blue Water raised approximately $58 million from the sale of 5,750,000 units at $10 per unit.

**Answer:** EGS admits the allegations in Paragraph 6.

7. Blue Water's charter allowed a specified period of time for Blue Water to identify and consummate a business combination with another company. If it failed to do so, the funds raised in its IPO (plus interest) would have to be refunded to the public shareholders.

In contrast, the Founder Shares and warrants purchased by Blue Water's sponsor would be worthless.

**Answer:** EGS denies the allegations in Paragraph 7. To the extent that Paragraph 7 refers to Blue Water's charter, EGS refers to that document for its complete and accurate contents. EGS otherwise denies.

8. Following the initial public offering, Blue Water purported to search for a privately owned company with which it could enter into a business combination transaction using the funds it had raised in the IPO.

**Answer:** EGS denies the allegations in Paragraph 8, except admits that Blue Water investigated a number of companies for acquisition after its IPO..

9. The search was conducted by Defendant Y. Joseph Hernandez, who was both: (a) managing member of Blue Water's sponsor and controlling shareholder, Sponsor, and (b) Chief Executive Officer and Chairman of the Board of Directors of Blue Water.

**Answer:** EGS denies the allegations in Paragraph 9 except admits that Joseph Hernandez was the managing member of Sponsor and Chief Executive Officer and Chairman of the Board of Directors of Blue Water.

10. Acting at what Hernandez described as, "warp speed," Hernandez chose financially struggling, single-product pharmaceutical company, Clarus, for the business combination.

**Answer:** EGS denies the allegations in Paragraph 10. EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 10 regarding comments made by Hernandez, and therefore denies same.

11. Other than Hernandez, the Blue Water board of directors was not involved in the selection of Clarus as the target for Blue Water's business combination. Nor was the board of directors engaged in evaluating any alternatives to a business combination with Clarus.

**Answer:** EGS denies the allegations in Paragraph 11.

12. No independent, non-conflicted person or entity provided a formal appraisal or assessment of the value of Clarus for Blue Water in connection with the business combination. Instead, Hernandez consulted with his friends at Maxim Group who provided information regarding publicly traded companies that allowed Hernandez to cover for his failure to properly assess Clarus's value.

**Answer:** EGS denies the allegations in Paragraph 12 except, to the extent that "formal" means an unaffiliated third-party, admitted. EGS further lacks knowledge or information sufficient to respond to the allegations in Paragraph 12 regarding Hernandez's communications with Maxim Group and therefore denies same.

13. And no independent, non-conflicted person or entity attempted to evaluate the business combination with Clarus to determine whether it was fair to Blue Water or in the best interests of Blue Water.

**Answer:** EGS denies the allegations in Paragraph 13.

14. Instead, Clarus was identified as an acquisition target by Defendant Hernandez, who was conflicted as a result of his ownership interest in, and control over, Sponsor.

**Answer:** Paragraph 14 contains conclusions of law to which no response is required. To the extent that a response is required, EGS denies the allegations in Paragraph 14.

15. Ownership of the Founder Shares gave Sponsor interests that diverged from the best interests of Blue Water. Although Sponsor would prefer a good deal over a bad one,

Sponsor would be left empty handed if Blue Water did not enter into a business combination, since Sponsor's Founder Shares and private placement units would be worthless. Therefore, Sponsor's interests were served by a bad deal versus no deal at all. In contrast, Blue Water's interests would have been better served by completely passing on the Clarus combination.

**Answer:** Paragraph 15 contains conclusions of law to which no response is required. To the extent that a response is required, EGS denies the allegations in Paragraph 15.

16. The disclosure of the extent of this conflict in the proxy statement sent to shareholders prior to the vote on the business combination was incomplete and woefully inadequate. *See* Proxy Statement/Prospectus of Blue Water Acquisition Corp. ("Proxy Statement") at https://www.sec.gov/Archives/edgar/data/1817944/000121390021038392/f424b30721_bluewater.htm. Although the Proxy Statement disclosed that Sponsor had a conflict, the Proxy Statement failed to disclose that each of Blue Water's directors, who approved the business combination with Clarus, owned an interest in Sponsor and therefore also had a conflict.

**Answer:** EGS denies the allegations in Paragraph 16. To the extent that Paragraph 16 refers to the Proxy Statement, EGS refers to that document for its complete and accurate contents.

17. Throughout the process of raising funds, identifying an acquisition target, and completing the business combination, Blue Water was represented by Ellenoff. At the same time, Ellenoff was representing Sponsor. Although the fact of Ellenoff's dual representation was mentioned in the attached Merger Agreement, the Proxy Statement failed to disclose the

dual representation as a potential conflict. Nor did the Proxy Statement disclose that Ellenoff needed a closing of a business combination to occur in order to collect its fees.

**Answer:** EGS denies the allegations in Paragraph 17, except admits that while EGS represented Blue Water, EGS also represented Sponsor in connection with certain specific matters. To the extent that Paragraph 17 refers to the Proxy Statement, EGS refers to that document for its complete and accurate contents.

18. With the material assistance of Ellenoff and Maxim Group, and ignoring their duties of loyalty and care including red flags associated with Clarus throughout the process, Hernandez and Sponsor pushed the business combination through an inactive and conflicted board and caused the deal to close despite the fact that private investment in public equity ("PIPE") financing had completely failed to materialize and that on the eve of closing, Clarus was on the brink of bankruptcy.

**Answer:** EGS denies the allegations in Paragraph 18.

19. Also ignoring their duties of loyalty, the other Blue Water directors, Defendants Murphy, Sapirstein, Lerner, and McBurney, despite their conflicting interests, participated in the votes to approve the Merger Agreement and the closing of the business combination, unanimously approving both.

**Answer:** EGS denies the allegations in Paragraph 19.

20. The transaction was unfair to Blue Water in terms of process and price. Contributing to the unfairness of the process of the transaction, the Proxy Statement, which was primarily drafted by Ellenoff, omitted material information and contained misleading information relating to material facts.

**Answer:** EGS denies the allegations in Paragraph 20.

21. The business combination with Clarus was unfair in the price of the transaction as well. Contrary to the advocacy of Hernandez, with the substantial assistance of Maxim Group, Blue Water investment of approximately $24 million in Clarus was completely unfair for Blue Water. Clarus had never been profitable, had significant debt, and was on the brink of bankruptcy.

**Answer:** EGS denies the allegations in Paragraph 21.

22. Within a year of the closing of the business combination, Clarus had filed for bankruptcy and Blue Water's investment was completely lost.

**Answer:** EGS admits that Clarus filed for bankruptcy on September 5, 2022, but otherwise denies the allegations in Paragraph 22.

**Bankruptcy Procedural Background**

23. On September 5, 2022, Clarus Therapeutics Holdings, Inc. and Clarus Therapeutics, Inc., filed with this Court voluntary petitions under Chapter 11 of the Bankruptcy Code. [D.I. 1].

**Answer:** EGS admits the allegations in Paragraph 23.

24. On February 9, 2023, the First Amended Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Clarus Therapeutics Holdings, Inc. and Clarus Therapeutics, Inc. [D.I. 270] (the "**Plan**") was approved by the entry of the Court's Findings of Fact and Conclusions of Law, and Order Approving and Confirming the First Amended Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Clarus Therapeutics Holdings, Inc. and Clarus Therapeutics, Inc. [D.I. 320] (the "**Confirmation Order**"). Among other things, the Confirmation Order approved the appointment of Gavin/Solmonese LLC as the Plan Administrator. Confirmation Order at 12, ¶ 6.

**Answer:** EGS denies the allegations in Paragraph 24. To the extent that Paragraph 24 refers to the Plan and Confirmation Order, EGS refers to those documents for their complete and accurate contents.

**Parties**

25. Pursuant to the terms of the Plan, the Confirmation Order, and the Creditor Trust Agreement, the Plan Administrator is authorized and has standing to prosecute the "Retained Causes of Action" (as that term is defined in the Plan). The claims asserted in this Complaint are Retained Causes of Action.

**Answer:** EGS denies the allegations in Paragraph 25. To the extent that Paragraph 25 refers to the Plan, Confirmation Order and Creditor Trust Agreement, EGS refers to those documents for their complete and accurate contents.

26. Defendant Blue Water Sponsor, LLC is a Delaware limited liability company that served as Blue Water's sponsor. Sponsor's managing member was Y. Joseph Hernandez, and Defendants Hernandez, Lerner, Murphy, Sapirstein, and McBurney all held ownership interests in Sponsor. For the nominal price of $25,000, Sponsor purchased 1,437,500 Founder Shares in Blue Water. In addition, for $3,445,000, Sponsor purchased 3,445,000 placement warrants, each exercisable for one share of common stock at $11.50 per share. Sponsor has been cancelled by the Delaware Secretary of State as of June 1, 2023 for failure to pay tax, and its registered agent resigned on February 19, 2024 without replacement. Therefore, Sponsor may be served pursuant to Bankruptcy Rule 7004(3) by serving the Delaware Secretary of State pursuant to 6 Del. C. § 18- 1107(f) and 6 Del. C. § 18-105(b) and by mailing a copy to its principal business address, which is 15 Putnam Avenue, Suite 363, Greenwich, Connecticut 06830.

**Answer:** EGS denies the allegations in Paragraph 26, except (i) EGS admits that Sponsor purchased 1,437,500 shares of Blue Water's Class B common stock for $25,000, (ii) EGS admits that Y. Joseph Hernandez was managing member of Sponsor, and (iii) EGS admits that Blue Water consummated a private placement of 3,445,000 warrants at a price of $1.00 per private placement warrant to the Sponsor, generating proceeds of approximately $3.4 million. The last sentence of Paragraph 26 states conclusions of law to which no response is required. To the extent that a response is required, EGS denies the last sentence in Paragraph 26.

27. Defendant Y. Joseph Hernandez is the managing member of Sponsor and former CEO and Chairman of the Blue Water Board of Directors. Mr. Hernandez may be served pursuant to Bankruptcy Rule 7004(b)(1) by first class mail to his dwelling house or usual place of abode at 225 Cherry Street, Apartment 65 C, New York, New York 10002.

**Answer:** Paragraph 27 states legal conclusions to which no response is required. To the extent that a response is required, EGS admits that Y. Joseph Hernandez is the managing member of Sponsor and former CEO and Chairman of the Blue Water Board of Directors, but otherwise lacks knowledge or information sufficient to respond to the allegations in Paragraph 27, and therefore denies same.

28. Defendant Michael Lerner is a former director of Blue Water and member of Sponsor. Mr. Lerner may be served pursuant to Bankruptcy Rule 7004(b)(1) by first class mail to his dwelling house or usual place of abode at 5 Woodhill Road, Tenafly, New Jersey 07670.

**Answer:** Paragraph 28 states legal conclusions to which no response is required. To the extent that a response is required, EGS admits that Michael Lerner is a former director of Blue Water, but otherwise lacks knowledge or information sufficient to respond to the allegations in Paragraph 28, and therefore denies same.

29. Defendant Kimberly Murphy is a former director of Blue Water and member of Sponsor. Ms. Murphy may be served pursuant to Bankruptcy Rule 7004(b)(1) by first class mail to her dwelling house or usual place of abode at 520 Carpenter Lane, Apt. 1F, Philadelphia, Pennsylvania 19119.

**Answer:** Paragraph 29 states legal conclusions to which no response is required. To the extent that a response is required, EGS admits that Kimberly Murphy is a former director of Blue Water, but otherwise lacks knowledge or information sufficient to respond to the allegations in Paragraph 29, and therefore denies same..

30. Defendant James Sapirstein is a former director of Blue Water and member of Sponsor. Mr. Sapirstein may be served pursuant to Bankruptcy Rule 7004(b)(1) by first class mail to his dwelling house or usual place of abode at 5310 Boca Marina Circle, N. Boca Raton, Florida 33487.

**Answer:** Paragraph 30 states legal conclusions to which no response is required. To the extent that a response is required, EGS admits that James Sapirstein is a former director of Blue Water, but otherwise lacks knowledge or information sufficient to respond to the allegations in Paragraph 30, and therefore denies same.

31. Defendant Yvonne McBurney is a former director of Blue Water and member of Sponsor. Ms. McBurney may be served pursuant to Bankruptcy Rule 7004(b)(1) by first class mail to her dwelling house or usual place of abode at 1372 Calle Luchetti, Apt. 300, San Juan, Puerto Rico, 00907.

**Answer:** Paragraph 31 states legal conclusions to which no response is required. To the extent that a response is required, EGS admits that Yvonne McBurney is a former director of

Blue Water, but otherwise lacks knowledge or information sufficient to respond to the allegations in Paragraph 31, and therefore denies same.

32. Defendant Ellenoff Grossman & Schole LLP is a law firm that holds itself out as having particular expertise in advising SPACs. Its website states that since 2008, Ellenoff has been one of the leading U.S. law firms involved in SPACs, and that over the last decade, Ellenoff has been "the most active law firms [sic] in the SPAC program" as it has "worked on nearly 40% of the SPACs during that time period," either as issuer's or underwriter's counsel. *See* https://www.egsllp.com/practice-areas/spacs-and-alternative-public-offerings; https://www.egsllp.com/resources/spacs. Pursuant to Bankruptcy Rule 7004(b)(3), it may be served by first class mail to the attention of an officer, a managing or general agent, or to any other agent authorized by appointment or law to receive service of process at its principal place of business at 1345 Avenue of The Americas, New York, New York 10105. Ellenoff represented Blue Water and Sponsor at all times prior to the closing of its business combination.

**Answer:** EGS denies the allegations in Paragraph 32, except admits that while EGS represented Blue Water, EGS also represented Sponsor in connection with certain specific matters. The fourth sentence of Paragraph 32 states conclusions of law to which no response is required. To the extent that a response is required, EGS denies the allegations in the fourth sentence of Paragraph 32. To the extent that Paragraph 32 refers to EGS' website, EGS refers to the website for its complete and accurate contents.

33. Defendant Maxim Group, LLC is an investment banking firm that holds itself out as a "leading SPAC underwriter & advisor." According to Maxim Group, since January 1, 2003, it has been involved with 230 of the 980 (approx. 23.5%) SPAC IPOs. By an agreement

with an effective date of April 27, 2021, Maxim Group became Blue Water's "financial advisor in connection with the proposed Business Combination." Maxim Group letter dated April 27, 2021, ¶ 2. Pursuant to Bankruptcy Rule 7004(b)(3), it may be served by first class mail to the attention of an officer, a managing or general agent, or to any other agent authorized by appointment or law to receive service of process at its principal place of business at 300 Park Avenue, 16th Floor, New York, New York 10022.

**Answer:** Paragraph 33 states conclusions of law to which no response is required. To the extent that a response is required, EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 33, and therefore denies same. To the extent that Paragraph 33 refers to a Maxim Group letter dated April 27, 2021, EGS refers to that document for its complete and accurate contents.

## Jurisdiction and Venue

34. The Court has jurisdiction over this matter pursuant to 28 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.

**Answer:** Paragraph 34 states conclusions of law to which no response is required.

35. Venue is proper in the Court under 28 U.S.C. § 1409(a).

**Answer:** Paragraph 35 states conclusions of law to which no response is required.

36. The claims asserted in the Complaint are both core and non-core.

**Answer:** Paragraph 36 states conclusions of law to which no response is required.

37. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b), as the matters complained of in the Complaint arise in and/or are related to the Chapter 11 cases pending before the Court, *In re Clarus Therapeutics Holdings, Inc.,* Jointly Administered, Case No. 22- 10845 (MFW).

**<u>Answer:</u>** Paragraph 37 states conclusions of law to which no response is required.

38. Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Plaintiff consents to the entry of a final order by the Court in connection with this adversary proceeding to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution. The Plan Administrator, on behalf of Clarus Therapeutics Holdings, Inc. has consented and hereby consents to the adjudication of these claims in the Court.

**<u>Answer:</u>** Paragraph 38 states conclusions of law to which no response is required. To the extent that a response is required, EGS denies the allegations in Paragraph 38. By way of further response, EGS does not consent to entry of final orders or judgments by the Court.

## <u>Statement of Facts Supporting Relief</u>

### I. Background

39. Special purpose acquisition companies ("SPACs") tend to follow a formulaic structure that the Delaware Court of Chancery has recognized to be susceptible to potential conflicts of interest. Blue Water is no different.

**<u>Answer:</u>** EGS denies the allegations in Paragraph 39.

40. Indeed, to represent Sponsor and Blue Water as counsel, Hernandez hired Ellenoff—a law firm that boasts on its website that it is one of the most active in the country in working with SPACs.

**<u>Answer:</u>** EGS denies the allegations in Paragraph 40, except admits that while EGS represented Blue Water, EGS also represented Sponsor in connection with certain specific matters.

### *A. Special Purpose Acquisition Companies*

41. SPACs are shell companies (meaning that they have no day-to-day operations). SPACs are formed by a sponsor/management team for the purpose of raising capital in an initial public offering in anticipation of identifying an acquisition target and consummating a business combination.

**Answer:** EGS denies the allegations in Paragraph 41.

42. A sponsor entity typically incorporates the SPAC, bears the start-up costs, registers the SPAC with the Securities and Exchange Commission, and conducts the IPO.

**Answer:** EGS denies the allegations in Paragraph 42.

43. The SPAC's sponsor typically purchases shares of stock in the SPAC, often 20% of the SPACs stock, for a nominal price. These shares are often referred to as Founders Shares.

**Answer:** EGS denies the allegations in Paragraph 43.

44. The sponsor may also purchase placement warrants that will entitle it to purchase stock for a set price in the future.

**Answer:** EGS denies the allegations in Paragraph 44.

45. Through its IPO, a SPAC will typically sell units for $10 per unit. Purchases of units in the IPO are often referred to as the public shareholders (in contrast with the owners of the founder shares). Each unit consists of one share of common stock and a warrant (often a fractional warrant) that will allow for the purchase of a share of common stock for a set price, for example, $11.50 per share.

**Answer:** EGS denies the allegations in Paragraph 45.

46. The SPAC then engages in a search to find an acceptable acquisition target. Once identified, the SPAC will negotiate and attempt to reach an agreement for a business combination. The transaction through which the target company is acquired is frequently referred to as a "**deSPAC**" transaction.

**Answer:** EGS denies the allegations in Paragraph 46.

47. Money raised via the IPO from the public shareholders is required to be held in trust and may be used only if a target company is identified and acquired (*i.e.* only after consummation of the business combination).

**Answer:** EGS denies the allegations in Paragraph 47.

48. If the SPAC fails to acquire a target company within the time frame set forth in its charter, usually twelve months with the ability to extend for an additional six months, the following will occur:

a. The SPAC must be liquidated and all funds held in trust plus interest are returned to the public shareholders;

b. The Founder Shares and placement warrants held by the sponsor become worthless; and

c. Expenses incurred by the SPAC, including professional fees, may only be paid with funds not held in trust, which as a practical matter means that the sponsor and directors who make loans to the SPAC will not be repaid and professionals who worked for the SPAC will not be paid in full.

**Answer:** EGS denies the allegations in Paragraph 48.

49. Depending on the structure of the business combination, the SPAC's shareholders typically vote on whether to approve a business combination. For any type of deSPAC transaction, the public shareholders have the option to redeem their stock for the price

they paid plus interest. But when a shareholder vote is held, the vote of a particular shareholder is not tied to the shareholder's decision whether or not to redeem. In other words, a shareholder may vote to approve a business combination and still elect to redeem his or her stock.

**Answer:** EGS denies the allegations in Paragraph 49.

### *B. Blue Water Followed the General SPAC Playbook*

50. Blue Water was incorporated as a SPAC on May 22, 2020. It was created by its sponsor/management team of Defendants Sponsor and Y. Joseph Hernandez.

**Answer:** EGS denies the allegations in Paragraph 50, except admits that Blue Water was incorporated as a SPAC on May 22, 2020.

51. Defendants Hernandez and Sponsor created Blue Water and funded its start-up with, among other things, the purchase of Founder Shares and placement warrants.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 51 and therefore denies same.

52. Specifically, Sponsor purchased 1,437,500 shares of Class B Common Stock (roughly 20% of the SPACs equity) for $25,000. These Founder Shares would convert to Class A common stock upon closing of Blue Water's initial business combination and would be subject to a 180-day lock-up period from that date during which the stock could not be sold.

**Answer:** EGS denies the allegations in Paragraph 52, except admits that Sponsor purchased 1,437,500 shares of Class B common stock for $25,000.

53. Sponsor also purchased 3,445,000 placement warrants for $3,445,000, each warrant exercisable for one share of Class A Common Stock at $11.50 per share.

**Answer:** EGS denies the allegations in Paragraph 53, except admits that Sponsor purchased an aggregate of 3,445,000 placement warrants for a purchase price of $1.00 per warrant, for an aggregate purchase price of $3,445,000.

54. Blue Water held its IPO on December 15, 2020, raising $57,500,000 through the sale of 5,750,000 units to public shareholders. Each unit consisted of one share of Class A common stock and a warrant that allowed for the purchase of one additional share of stock at a price of $11.50 per share.

**Answer:** EGS denies the allegations in Paragraph 54, except admits that on December 17, 2020, Blue Water consummated its IPO of 5,750,000 units generating gross proceeds of $57,500,000.

55. Blue Water's charter required the money raised from the public shareholders in the IPO to be held in trust until either the consummation of a business combination or the return of funds to the public shareholders.

**Answer:** EGS denies the allegations in Paragraph 55. To the extent that Paragraph 55 refers to the Blue Water Charter, EGS refers to that document for its complete and accurate contents.

56. Blue Water's charter provided that if Blue Water did not complete a business combination with a target company within an allotted time frame (twelve months with a potential extension to eighteen months), then the following would occur:

a. Blue Water was required to distribute all funds held in trust to the public shareholders;

b. The 1,437,500 Founder Shares and the 3,445,000 placement warrants owned by Sponsor, would be worthless; and

c. Limited funds would be available to pay for Blue Water's expenses, including directors' expenses and professional fees.

**Answer:** EGS denies the allegations in Paragraph 56. To the extent that Paragraph 56 refers to the Blue Water Charter, EGS refers to that document for its complete and accurate contents.

57. As discussed in more details, *infra*, Blue Water entered into a merger agreement with Clarus, and Blue Water held a shareholder meeting to approve the business combination on August 27, 2021 (referred to herein as the "**Business Combination**"). In addition to that vote, and regardless of whether a stockholder voted to approve the Business Combination or not, the Blue Water public shareholders had the right to redeem their shares for full value.

**Answer:** EGS denies the allegations in Paragraph 57, except admits that Blue Water entered into a merger agreement with Clarus, and Blue Water held a shareholder meeting on August 27, 2021.

## II. Blue Water's Sponsor, Board of Directors, Counsel, and Financial Advisor All Had Conflict of Interest with Regard to the Business Combination

58. Blue Water's Sponsor, board of directors, financial advisor, and counsel all had divided loyalties with regard to the Business Combination.

**Answer:** Paragraph 58 states conclusions of law to which no response is required. To the extent that a response is required, EGS denies the allegations in Paragraph 58.

### *A. Sponsor Had a Conflict of Interest with Regard to the Business Combination*

59. Sponsor had a conflict of interest with regard to the Business Combination because it stood to receive a unique benefit that was not aligned with the best interest of the company resulting from its ownership of Founder Shares.

**Answer:** Paragraph 59 states conclusions of law to which no response is required. To the extent that a response is required, EGS denies the allegations in Paragraph 59.

60. Sponsor faced significant economic loss if Blue Water did not consummate a business combination with an acquisition target because:

a. The Founder Shares and private placement warrants it owned would be worthless;

b. Sponsor would lose its entire investment in Blue Water – an aggregate of $3,470,000, comprised of the $25,000 purchase price for the Founder Shares and the $3,445,000 purchase price for the placement warrants; and

c. Sponsor would also lose out on any unreimbursed expenses it advanced for benefit of Blue Water.

**Answer:** EGS denies the allegations in Paragraph 60.

61. The Merger Agreement assumed a Blue Water share value of $10 per share. Based on that value, 1,437,500 Founder Shares would have an aggregate implied value of approximately $14.4 million.

**Answer:** EGS denies the allegations in Paragraph 61. To the extent that Paragraph 61 refers to the Merger Agreement, EGS refers to that document for its complete and accurate contents.

62. But even if the Business Combination were not well received by the market and the trading price of New Blue Water common stock were to fall as low as $2.41 per share, rendering the placement warrants worthless, the value of the Founder Shares would be approximately equal to Sponsor's initial investment in Blue Water.

**Answer:** EGS denies the allegations in Paragraph 62. To the extent that Paragraph 62 refers to the Proxy Statement, EGS refers to that document for its complete and accurate contents.

63. Thus Sponsor was likely to make money from its investments in Blue Water, or at least recapture all or part of its investment, even if the transaction were not in the best interest of the company and caused Blue Water's stock price to fall precipitously.

**Answer:** EGS denies the allegations in Paragraph 63.

64. In contrast, if a business combination were not completed by Blue Water, then the Founder Shares and the placement warrants owned by Sponsor would be worthless. Sponsor would lose its entire investment and get nothing in return.

**Answer:** EGS denies the allegations in Paragraph 64.

65. As a result, Sponsor had an economic incentive to enter into a business combination with a riskier, weaker-performing or financially unstable business, or an entity lacking an established record of revenues or earnings as long as such business combination would close.

**Answer:** EGS denies the allegations in Paragraph 65.

### *B. Each of the Blue Water Directors Had a Conflict of Interest with Regard to the Business Combination*

66. All of the Blue Water directors had a similar personal financial interest in ensuring a business combination occurred, whether it was a good deal for the company or not.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 66 and therefore denies same.

67. Hernandez was the sole managing member of Sponsor, which owned Founder Shares.

**Answer:** EGS denies the allegations in Paragraph 67, except admits that Hernandez was the managing member of Sponsor. .

68. In addition to Hernandez's control of Sponsor, he had a significant ownership interest in Sponsor as well, which gave him, in effect, the benefit of owning well over a million Founder Shares in Blue Water. Using the $10 per share assumption of the Merger Agreement, Hernandez's interest in Sponsor would have an implied value of approximately $10,000,000.

**Answer:** EGS denies the allegations in Paragraph 68.

69. In February 2021, Sponsor, with the substantial assistance of Ellenoff, granted membership interests to each of the other Blue Water directors. The membership interests Sponsor transferred to each Blue Water director corresponded to 10,000 shares of common stock in Blue Water. Using the $10 per share assumption of the Merger Agreement, each of these directors' interest in Sponsor would have an implied value of approximately $100,000. Thus, each of the other directors, Kimberly Murphy, Michael Lerner, James Sapirstein, and Yvonne McBurney, also had a material personal financial interest in the Business Combination through their ownership interest in Sponsor.

**Answer:** Paragraph 69 contains legal conclusions to which no response is required. To the extent that a response is required, EGS denies the allegations in Paragraph 69.

70. This ownership interest in Sponsor was the only form of compensation for these directors to serve on the Blue Water board. Therefore, if Blue Water did not close on a business combination, Defendants Murphy, Sapirstein, Lerner, and McBurney would be paid nothing for being Blue Water directors.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 70 and therefore, denies same.

71. In addition to his personal financial interest through his ownership interest in Sponsor, Hernandez had an additional interest in the consummation of the Business Combination because he would remain as a director of the combined entity following the Business Combination and entitled to be paid for that role.

**Answer:** EGS denies the allegations in Paragraph 71, except admits that Hernandez would remain as a director of the combined entity.

72. Similarly, in addition to her personal financial interest through her ownership interest in Sponsor, Kimberly Murphy also had an additional interest in the consummation of the Business Combination as she planned to remain as a director of the combined entity following the Business Combination.

**Answer:** EGS denies the allegations in Paragraph 72, except admits that Kimberly Murphy would remain as a director of the combined entity.

73. Because the money Blue Water raised in the IPO was required to be held in trust until the consummation of a business combination, all directors were unlikely to be reimbursed for their out-of-pocket expenses, unless Blue Water consummated an initial business combination.

**Answer:** EGS denies the allegations in Paragraph 73.

74. In addition to the conflicts noted above, the other Blue Water directors were not independent of Hernandez. They were obliged to Hernandez for appointment to the Blue Water board, the potentially lucrative grant of ownership interest in Sponsor, and the following, among other things:

a. In February 2021, Hernandez asked each of the other Blue Water directors, Defendants Murphy, Lerner, Sapirstein and McBurney, to be directors of

another SPAC, Blue Water Acquisition Corp. II, and each agreed to work with Hernandez on this company which they referred to as "**SPAC II.**" It was named Blue Water Acquisition Corp. II, Inc. and SEC filings indicate that Hernandez was its founder, it was represented by Ellenoff, and Maxim Group was engaged as its underwriter. These defendants expected to be compensated for their role with SPAC II in a similar manner as their interest in Blue Water through Sponsor; and

b. Along with Hernandez, Defendants Murphy and Sapirstein were both directors of another company controlled by Hernandez, Blue Water Vaccines, Inc. ("**Blue Water Vaccines**"). SEC filings indicate that Hernandez was the founder and served as Chairman and Chief Executive Officer of Blue Water Vaccines at that time. Murphy held a significant number of options to purchase shares in the company.

**Answer:** Paragraph 74 states conclusions of law to which no response is required. To the extent that a response is required, EGS denies the allegations in Paragraph 74. To the extent that Paragraph 74 refers to SEC filings, EGS refers to those documents for their complete and accurate contents.

### *C. Ellenoff had Conflicts of Interest with Regard to the Business Combination*

75. Ellenoff also had conflicts of interest with regard to the Business Combination. As a result of these conflicts, Ellenoff's interest were not aligned with the best interests of Blue Water.

**Answer:** EGS denies the allegations in Paragraph 75.

76. From its inception through the consummation of the Business Combination, Ellenoff represented Blue Water. As counsel to Blue Water, Ellenoff occupied a position of trust with the company and its board of directors. Among other things, Ellenoff advised Blue Water regarding confidentiality agreements with acquisitions targets, the Clarus letter of intent and Merger Agreement, attempts to raise PIPE and other fundings, filings with the Securities and Exchange Commission, the shareholders vote and redemption process, and all phases of corporate governance and the Business Combination. As part of this, Ellenoff attended meetings of the BWAC SPAC Committee (discussed below) and the Blue Water board of directors.

**Answer:** EGS denies the allegations in Paragraph 76.

77. But throughout that same period of time, Blue Water also represented Sponsor. As detailed above, Sponsor had a significant economic interest in ensuring a business combination deal would close – any deal, even if it were a bad deal for Blue Water. Thus, with regard to the Business Combination, Ellenoff was tasked with serving clients with divergent interests.

**Answer:** EGS denies the allegations in Paragraph 77, except admits that while EGS represented Blue Water, EGS also represented Sponsor in connection with certain specific matters.

78. Ellenoff also had a significant financial self-interest in ensuring a business combination closed, even if it was a bad deal for the company.

**Answer:** EGS denies the allegations in Paragraph 78.

79. Only after the closing of a business combination would cash raised in the IPO be released from the trust account and used to pay, *inter alia*, Blue Water's transaction expenses,

including professional fees. Therefore, Ellenoff was unlikely to collect a significant portion of its legal fee unless Blue Water closed on the Business Combination.

**Answer:** EGS denies the allegations in Paragraph 79.

80. Further, Ellenoff had a contingent portion of its legal fee. A portion of its fee was deferred until closing. But if no closing occurred, this portion of the fee is only due to the extent the company has cash available to pay it. Plus, if closing occurred, Ellenoff was entitled to a bonus payment.

**Answer:** EGS denies the allegations in Paragraph 80.

81. In total, Ellenoff had over a million dollars in fees that would only be collected if a closing were to occur.

**Answer:** EGS denies the allegations in Paragraph 81.

### *D. Maxim Group Had a Conflict of Interest with Regard to the Business Combination*

82. Blue Water's financial advisor, Maxim Group, was owed over $2,000,000 in fees for serving as underwriter for the IPO that would only be paid if the Business Combination closed and the funds held in trust were released for use in paying Blue Water's expenses.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 82 and therefore denies same.

83. In addition, Blue Water agreed to pay Maxim Group a $250,000 fee for acting as its financial advisor concerning the Business Combination. But, that fee also would only be paid if a Business Combination were to close.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 83 and therefore denies same.

84. Further, Maxim Group received 50,000 shares of Class A Blue Water stock as part of its compensation for underwriting the Blue Water IPO. That stock, however, could not be redeemed in connection with the Business Combination or if Blue Water were to dissolve the trust because it had not found a company with which to combine within the time frame established by its charter. Therefore, this stock would only have value for Maxim Group if the Business Combination were to close.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 84 and therefore denies same.

85. This gave Maxim Group, with which Blue Water's management consulted as its financial advisor "in connection with its evaluation of Clarus," which purportedly included "a review of information on other publicly traded companies in the life sciences and healthcare industries," a strong self-interest in closing on a deal, even if that deal was not in the best interests of Blue Water. *See* Proxy Statement at 118.

**Answer:** EGS admits that "Blue Water's management consulted with Maxim in connection with its evaluation of Clarus, including a review of information on other publicly traded companies in the life sciences and healthcare industries," but otherwise lacks knowledge or information sufficient to respond to the allegations in Paragraph 85 and therefore denies same. To the extent that Paragraph 85 refers to the Proxy Statement, EGS refers to that document for its complete and accurate contents.

86. As a result, Maxim Group substantially assisted Hernandez in pushing a deal through, including failing to advise the Blue Water directors that the Business Combination was not in the best interests of Blue Water—even though it clearly was not. Nor did they advise that, at the very least, Blue Water ought to take time to identify other potential targets

and seriously consider them. Instead, along with Sponsor and Hernandez, Maxim Group knowingly assisted in creating an informational vacuum for the Blue Water directors regarding the value of Clarus.

**Answer**: EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 86 and therefore denies same.

87. Thus, Sponsor, the directors, Blue Water's counsel, and Blue Water's financial advisor all had a conflicts between what was best for them and what was best for Blue Water.

**Answer:** EGS denies the allegations in Paragraph 87.

## III. Sponsor Was a Controlling Shareholder Prior to the Business Combination

88. Prior to the Business Combination, Sponsor was the controlling shareholder of Blue Water under Delaware law. Sponsor exercised actual control over the board and management of Blue Water.

**Answer:** Paragraph 88 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 88.

89. Sponsor, through its managing member, Defendant Hernandez, controlled Blue Water and its board by dominating the board's "corporate decision-making process" while it considered the Business Combination:

a. Sponsor, through its managing member, Defendant Hernandez, conducted Blue Water's efforts to identify a target for acquisition; and

b. Sponsor, again though its managing member, Hernandez, who was also the Chief Executive Officer and Chair of the board of Blue Water, controlled the information that was (and was not) provided to the Blue Water board of directors regarding Clarus and the Business Combination.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 89 and therefore denies same.

90. Sponsor also controlled a majority of the board generally:

a. Sponsor nominated the members of the Blue Water board;

b. As owner of the Founders Shares, Sponsor had the right to elect all of Blue Water's directors prior to the Business Combination;

c. Sponsor also had the right to remove a director of Blue Water as Blue Water's charter provided that "prior to the closing of the initial Business Combination, the holders of [the Founder Shares] shall have the exclusive right to elect and remove, with or without cause, any director…," December 16, 2020 Amended and Restated Certificate of Incorporation of Blue Water Acquisition Corp., Article IX, § 9.9;

d. Sponsor, through its managing member Hernandez, took actions without board knowledge or approval to identify potential acquisition targets and even made offers of letters of intent without input or approval from the board;

e. The Blue Water directors were aware of Sponsor's control over the board as they would learn, after the fact, of actions and agreements that Sponsor, through Hernandez, had taken without board involvement, and Sponsor's power over the board and its composition was reflected in the Blue Water Certificate of Incorporation; and

f. Despite the foregoing, the Blue Water board took no steps to neutralize Sponsor's control of the company or make Hernandez more accountable to the board.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 90 and therefore denies same. To the extent Paragraph 90 refers to the December 16, 2020 Amended and Restated Certificate of Incorporation of Blue Water Acquisition Corp., EGS refers to that document for its complete and accurate contents.

**IV. Sponsor (throughout Hernandez) with the Assistance of Ellenoff and Maxim exerted control over the board by controlling the information provided to the Blue Water Board.**

91. The Blue Water board relied on information provided by Hernandez, its counsel, Ellenoff, and its financial advisor, Maxim Group. Together, they created an information vacuum that deprived the board of material information and limited the board's ability to exercise its own judgment.

**Answer:** EGS denies knowledge or information as to what the Blue Water board relied on and otherwise denies the allegations in Paragraph 91.

92. For example,

a. Hernandez and Ellenoff first provided the board with the S-1 for Blue Water's Initial Public Offering at 3:49 pm Eastern the day the S-1 had to be filed with the SEC. Although board members complained about this short turn around, they approved the S-1. Approving the S-1 the day of filing was the board's only involvement with the IPO.

b. The board did not investigate target companies, which were "brought forward for [the board] to consider or for [the board] to be aware." The board received a presentation on only one company: Clarus.

c. The board voted to approve a Letter of Intent with Clarus (with a "no talk" provision) on January 27. Earlier that day, they received a power point

presentation regarding Clarus by email that was discussed at the meeting. But prior to that email, board members had done no investigation into Clarus.

d. Yvonne McBurney was given less than a day's notice of an audit committee meeting in December 2020 to approve an 8K in regards to Blue Water's IPO to be filed with the SEC. This was the first indication she had received that she was on the audit committee.

e. On May 12, 2021, the board was given a couple of hours to review a 200 page document. As a result, few questions were asked, causing one board member to opine, "probably people did not have time to read through the whole document."

f. Board meetings were called exclusively by Hernandez, were brief in duration and focused on approving actions already taken by Hernandez or proposed by Hernandez.

**Answer:** EGS denies the allegations in Paragraph 92. To the extent that Paragraph 92 refers to an S-1, EGS refers to that document for its complete and accurate contents. To the extent that Paragraph 92 refers to a Letter of Intent, EGS refers to that document for its complete and accurate contents. To the extent that Paragraph 92 refers to an email, EGS refers to that email for its complete and accurate contents.

93. Hernandez and Ellenoff met regularly with Clarus to discuss Clarus's financial difficulties, particularly as the date for closing of the Business Combination approached and Clarus continued to spend much more than it brought in, to the point where Clarus was in peril of having insufficient funds to continue its operations. But other than the presentation Clarus

gave the board shortly after signing the LOI, Blue Water's other board members had no contact with Clarus. Therefore, the Blue Water board relied on Hernandez and Ellenoff to provide updates on Clarus's status, and on Maxim Group to provide them with guidance as to Clarus's value.

**Answer:** EGS denies the allegations in Paragraph 93.

## V. Joe Hernandez Moved at "Warp Speed" to Identify a Target Acquisition for Blue Water and Enter into a Letter of Intent

94. The day after Blue Water's IPO, December 16, 2020, Joe Hernandez was introduced to Clarus.

**Answer:** EGS denies the allegations in Paragraph 94, except admits that on December 16, 2020, Hernandez was introduced to Clarus.

95. Hernandez was in a hurry and acted quickly and decisively; by December 24, 2020 he had told Dr. Robert Dudley, then President and CEO of Clarus, that he "wants to do this deal."

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 95 and therefore denies same.

96. Indeed, by December 24, 2020, Hernandez told Dudley that Clarus was "the" target. He did this without knowledge or approval of the board.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 96 and therefore denies same.

97. Hernandez signed a mutual confidentiality agreement with Clarus on behalf of Blue Water on December 28, 2020. Again, he did this without the knowledge or approval of the board.

**Answer:** EGS denies the allegations in Paragraph 97, except admits that Blue Water and Clarus executed a mutual confidentiality agreement on December 28, 2020.

98. And on January 7, 2020, apologizing for "[s]low lawyers," Hernandez informed Clarus that he hoped to have a letter of intent for a business combination "today or tomorrow."

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 98 and therefore denies same.

99. Hernandez provided the promised letter of intent and term sheet for a business combination with Clarus on January 12, 2021. That term sheet, drafted by Ellenoff, provided for a total enterprise value of Clarus of $175 million. Hernandez had neither informed nor obtained approval from the Blue Water directors for this letter of intent.

**Answer:** EGS denies the allegations in Paragraph 99, except admits that it assisted with drafting the term sheet.

100. Shortly after sending the term sheet to Clarus, Hernandez texted his Clarus point of contact to say, "Forgive the legal language bs. Let me know if there is anything in there you want to discuss before the call [with the Clarus board]. But I am committed to getting to a deal."

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 100 and therefore denies same.

101. To the Clarus representative who received the foregoing text, it suggested a sense of desperation on the part of Hernandez. Accordingly, the Clarus representative and a colleague called Hernandez that day, January 12, 2021. In that call, Hernandez increased Blue Water's offer to a total enterprise value of $200 million, a $25 million increase. Hernandez made this offer without conferring with the Blue Water directors.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 101 and therefore denies same.

102. Hernandez provided Clarus with a revised letter of intent reflecting the increased price on or about January 20, 2021.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 102 and therefore denies same.

103. Although McBurney, Lerner, Sapirstein, and Murphy were invited to join the Blue Water board by August 2020, they did not convene as a board until January 13, 2021, when they held an "Intro Call."

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 103 and therefore denies same.

104. The day of the "Intro Call" the Blue Water board was provided "a target list of companies we have evaluated/are in discussions with . . . ." That list identified 26 potential target companies and indicated that NDAs had been sent to 4 of them. Other than a brief discussion of the list, no potential acquisition targets other than Clarus were considered by the Blue Water board of directors, and the directors did not perform any investigation into these companies. Of the 26 companies on the list, Clarus was the only one to make a presentation to the Blue Water Board. Director McBurney, for example, has no recollection to support the claim in the Proxy Statement that Blue Water identified and evaluated 100 potential companies, including 47 with advanced due diligence and 12 with confidentiality agreements. See Proxy Statement at 111. Her recollection is that the Board's never discussed companies that were not on the list presented in advance of the January 13_Intro Call.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 104 and therefore denies same.

105. The Blue Water board next convened on January 27, 2021, to discuss a revised letter of intent from Clarus. Clarus's revisions were to the January 19 letter drafted by Ellenoff (and sent by Hernandez to Clarus on January 20).

**Answer:** EGS admits there was a board meeting on January 27, 2021, at which the Board considered the letter of intent with Clarus, but otherwise lacks knowledge or information sufficient to respond to the allegations in Paragraph 105 and therefore denies same.

106. By January 27, 2021, both Blue Water and Clarus had executed the letter of intent. Although the letter of intent states at the top that it is "non-binding," it contained a "no talk" provision, which for a period of at least 30 days restricted, among others, Blue Water's officers, directors, agents, financial and legal advisors from "solicit[ing] or initiat[ing] or enter[ing] into discussions, negotiations . . . concerning any Competing Transaction," which for Blue Water is defined as another business combination.

**Answer:** EGS denies the allegations in Paragraph 106, except admits that Blue Water executed the LOI with Clarus following a unanimous board vote in favor of signing. To the extent that Paragraph 106 refers to the January 27, 2021 letter of intent, EGS refers to that document for its complete and accurate contents.

107. This "no talk" provision limited the number of acquisition targets that Blue Water could consider.

**Answer:** EGS denies the allegations in Paragraph 107. To the extent that Paragraph 107 refers to the January 27, 2021 letter of intent, EGS refers to that document for its complete and accurate contents.

108. The January 27, 2021 letter of intent provides for a total enterprise value of Clarus of $203.125 million.

**Answer:** EGS denies the allegations in Paragraph 108. To the extent that Paragraph 108 refers to the January 27, 2021 letter of intent, EGS refers to that document for its complete and accurate contents.

109. By January 26, 2021, Hernandez was ready to move on to another SPAC, asking Ellenoff and Maxim Group for a call to discuss Blue Water Acquisition Corp. II. By February 2, 2021, Hernandez had signed an engagement agreement with Maxim Group relating to this new SPAC.

**Answer:** EGS admits that Hernandez emailed EGS asking to "speak later today" on January 26, 2021, but otherwise lacks knowledge or information sufficient to respond to the allegations in Paragraph 109 and therefore denies same.

**VI. Hernandez Continues to Push for Closing a Transaction, Ignoring Warning Signs that a Business Combination with Clarus Was Not in Blue Water's Best Interests**

110. After the letter of intent was signed, Hernandez continued to push towards the execution of a definitive merger agreement and closing of the Business Combination. Hernandez maintained this singular focus despite warning signs regarding Clarus's financial status in due diligence and throughout the process.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 110 and therefore denies same.

111. On February 9, 2021, Clarus's Chief Financial Officer, Steve Bourne, began to populate the data room for Blue Water's due diligence efforts.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 111 and therefore denies same.

112. Ellenoff led the review of material Clarus provided in the data room and prepared reports for Blue Water summarizing and analyzing the information.

**Answer:** EGS denies the allegations in Paragraph 112, except admits that it provided to Blue Water a report on IP diligence matters and the Lipocine litigation, as well as a draft report on other diligence matters.

113. A group was formed called the BWAC SPAC Committee, which consisted of members of the Clarus board and management, Hernandez, and Ellenoff lawyers. This group met frequently and discussed every development in the Business Combination process.

**Answer:** EGS denies the allegations in Paragraph 113.

114. On February 4, 2021, Clarus executives met with the Blue Water board and provided a presentation regarding Clarus's business.

**Answer:** EGS admits the allegations in Paragraph 114.

115. At Hernandez's request, Blue Water provided projections based on the infusion of $50 million from the Business Combination. This amount of money would have allowed for investments that Clarus hoped would lead to increased revenue.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 115 and therefore, denies same.

116. But even with these sanguine projections, the Clarus financials were concerning.

**Answer:** EGS denies the allegations in Paragraph 116.

117. Despite its poor track record, Hernandez was willing to go all in on Clarus. But there were red flags signaling a turn around was extremely unlikely.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 117 and therefore denies same.

118. Clarus disclosed to Blue Water "substantial doubt about our ability to continue as a going concern."

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 118 and therefore denies same.

119. It had been roughly a year since Clarus's sole product, an oral testosterone replacement drug called JATENZO, earned approval from the U.S. Food and Drug Administration. Clarus began marketing JATENZO in February 2020, but the company had never turned a profit.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 119 and therefore, denies same.

120. Clarus had a tremendous amount of debt, including a $50 million loan used for the JATENZO product launch. Clarus disclosed, "We have incurred significant indebtedness in connection with our business and servicing our debt requires a significant amount of cash. We may not have sufficient cash flow from our operations to satisfy the financial covenants in our debt agreements." Proxy Statement at 34.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 120. To the extent that Paragraph 120 refers to the Proxy Statement, EGS refers to that document for its complete and accurate contents.

121. In the three months ending March 31, 2021, Clarus had a net loss of $15,429,000. For the year ending December 31, 2020, its loss from operations was $47,177,000. *See* Proxy Statement at 37.

**Answer:** Paragraph 121 refers to the Proxy Statement, and EGS refers to that document for its complete and accurate contents.

### *A. Attempts to Secure PIPE Investment*

122. During the due diligence period, the parties attempted to secure private investment in public equity investment.

**Answer:** EGS denies the allegations in Paragraph 122, except admits that the Company attempted to obtain a "private investment in public equity".

123. PIPE investors lined up to consider the Business Combination, and they all passed on it without investing. Many explained their decision, offering negative feedback about Clarus and the Business Combination.

**Answer:** EGS denies the allegations in Paragraph 123.

124. By April 21, 2021, it was clear that the efforts to secure PIPE investment would be unsuccessful, and one of the companies hired to secure PIPE financing, BMO Capital Markets resigned as a result. BMO explained to Clarus that they could not in good faith participate in a non-deal road show to tell investors this was a good opportunity. Clarus relayed this comment to Hernandez and Ellenoff.

**Answer:** EGS denies the allegations in Paragraph 124.

### *B. The Merger Agreement*

125. Simultaneous with due diligence, counsel for the parties drafted the agreement to document the transaction. This "**Merger Agreement**" sets out the structure of the Business Combination. Blue Water and Blue Water Merger Sub Corp., a Delaware corporation and wholly owned subsidiary of Blue Water, consummated a reverse merger with Clarus. Blue Water Merger Sub Corp. merged with and into Clarus with Clarus surviving as a wholly

owned subsidiary of Blue Water, which then changed its name to Clarus Therapeutics Holdings, Inc.

**Answer:** EGS denies the allegations in Paragraph 125 except admits that the parties drafted a merger agreement. To the extent that Paragraph 125 refers to the merger agreement, EGS refers to that document for its complete and accurate contents.

126. On February 18, 2021, Ellenoff returned a revised copy of the Merger Agreement. In it, Ellenoff added a provision on "Legal Representation." In that section 12.16, Blue Water only purports to waive conflicts that arise in the future and does not purport to waive Ellenoff's conflicts from concurrently representing Blue Water and Sponsor. Section 12.6 also contains a provision that purports to allow Sponsor to control Blue Water's testimonial privileges.

**Answer:** EGS denies the allegations in Paragraph 126. To the extent that Paragraph 126 refers to a "revised copy of the Merger Agreement," EGS refers to that document for its complete and accurate contents.

127. The boards of Clarus and Blue Water met (separately) to approve the Merger Agreement during the weekend of April 24, 2021.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 127 and therefore denies same.

128. The Blue Water board of directors unanimously approved of the Merger Agreement. But the Blue Water board did so without employing well-recognized procedural safeguards, including the following:

a. The Blue Water board voted to approve the Merger Agreement without appointing an independent, disinterested special committee.

b. Nor did the Blue Water board engage a valuation specialist to evaluate Clarus and assess its value as an acquisition target.

c. Nor did the Blue Water board engage an independent expert to opine on the fairness of the Business Combination to Blue Water.

**Answer:** EGS denies the allegations in Paragraph 128.

### *C. On the eve of finalizing the Merger Agreement, Hernandez, Sponsor, Ellenoff, and Maxim Group assert their own interests at the expense of Blue Water's best interests.*

129. On or about April 25, 2021, an issue arose regarding the correct number of Founder Shares owned by Sponsor. The letter of intent reflected a lower number than Hernandez believed it should and that lower number was being used in connection with the Merger Agreement.

**Answer:** EGS denies the allegations in Paragraph 129. To the extent that Paragraph 129 refers to a letter of intent, EGS refers to that document for its complete and accurate contents. To the extent that Paragraph 129 refers to the Merger Agreement, EGS refers to that document for its complete and accurate contents.

130. In discussing this issue, Hernandez made clear to Clarus that the economic impact of this discrepancy to him, personally, would be huge.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 130 and therefore denies same.

131. To resolve this dispute, Hernandez suggested that 287,500 shares be added to Sponsor's shares *and* that same amount be added to Clarus's side of the transaction.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 131 and therefore denies same.

132. Hernandez's proposal, which was accepted by Clarus, had the effect of raising the "price" of the Business Combination for Blue Water by the value of those 287,500 shares. Thus, Hernandez had, again, put his personal interest ahead of the best interest of Blue Water.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 132 and therefore denies same.

133. In addition, on or about April 26, 2021, Ellenoff held up finalization of the Merger Agreement to insist upon clarification that Ellenoff was to be paid at closing expenses "that are not necessarily all transaction expenses for this deal."

**Answer:** EGS denies the allegations in Paragraph 133, except admits that it stated that "EGS is owed deferred expenses that are not necessarily all transaction expenses for this deal". To the extent that Paragraph 133 refers to an email, EGS refers to that document for its complete and accurate contents.

134. In a follow up email, an Ellenoff attorney explained, "Most of the SPAC's expenses, including banker fees and legal fees are deferred until closing and paid from the trust account . . . that is standard for every SPAC."

**Answer:** Paragraph 134 refers to an email and EGS refers to that document for its complete and accurate contents.

135. At that time, Blue Water owed Ellenoff approximately $300,0000 in accrued and unpaid professional fees and expenses.

**Answer:** EGS denies the allegations in Paragraph 135.

136. Also in late April, Maxim Group complained that its right of first refusal to be engaged to solicit PIPE financing had been overlooked. Maxim Group insisted on an

additional fee and a modified engagement agreement to give it an interest in future investments secured by the combined entity.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 136 and therefore denies same.

137. Maxim Group held up the signing of the Merger Agreement over this dispute.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 137 and therefore denies same.

### *D. The Proxy Statement*

#### *1. Preparation of the Proxy Statement*

138. After execution of the Merger Agreement, Blue Water prepared for its shareholder vote on the Business Combination.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 138 and therefore denies same.

139. Ellenoff took the lead on the Proxy Statement (S-4), preparing the initial draft on or about May 3, 2021.

**Answer:** EGS denies the allegations in Paragraph 139, except admits that it assisted in drafting the Proxy Statement.

140. On May 9, 2021, Ellenoff circulated a revised draft Proxy Statement adding to the Q&As the following question and answer: "Did the Blue Water Board obtain a third-party valuation or fairness opinion in determining whether or not to proceed with the Business Combination?" The answer provided: " . . . . In analyzing the Business Combination, the Blue Water Board and Blue Water's management conducted due diligence on Clarus and researched the industry in which Clarus operates and concluded that the Business Combination was in the

best interest of Blue Water's stockholders. Accordingly, you will be relying solely on the judgment of the Blue Water Board in valuing Clarus and assuming the risk that the Blue Water Board may not have properly valued such business." Proxy Statement at 12.

**Answer:** EGS denies the allegations in Paragraph 140. To the extent that Paragraph 140 refers to a revised draft Proxy Statement, EGS refers to that document for its complete and accurate contents. To the extent that Paragraph 140 refers to the Proxy Statement, EGS refers to that document for its complete and accurate contents.

141. On or about May 10, 2021, Ellenoff circulated a revised draft of the S-4, the Summary of Risk Factors, which includes the following warnings:

a. Some of Blue Water's and Clarus's officers and directors may be argued to have conflicts of interest that may influence them to support or approve the Business Combination without regard to the shareholders' interests; and

b. Blue Water did not seek an opinion from an unaffiliated third party as to the fair market value of Clarus, or that the price it is paying for Clarus, is fair to its shareholders from a financial point of view.

**Answer:** Paragraph 141 refers to a "revised draft of the S-4," and EGS refers to that document for its complete and accurate contents.

142. On or about July 28, 2021, Blue Water mailed to its stockholders a definitive Proxy Statement/Prospectus concerning the Business Combination. The Proxy Statement included the provisions referenced in paragraphs 140-41– above. It informed the stockholders of a special meeting to be held on August 12, 2021, at which stockholders would vote whether to approve or disapprove of the Business Combination. It also informed the stockholders that the deadline to redeem their shares was August 10, 2021.

**Answer:** EGS admits that Blue Water mailed to its stockholders a proxy statement/prospectus concerning the Business Combination, but otherwise lacks knowledge or information sufficient to respond to the allegations in Paragraph 142 and therefore denies same. To the extent that Paragraph 142 refers to a Proxy Statement/Prospectus mailed to stockholders on July 28, 2021, EGS refers to that document for its complete and accurate contents.

***2. Failure to Disclose Directors' Ownership Interest in Sponsor***

143. The Proxy Statement provides misleading and false information about the director's ownership interests in Sponsor.

**Answer:** Paragraph 143 states conclusions of law to which no response is required. To the extent that a response is required, EGS denies the allegations in Paragraph 143.

144. Although the Proxy Statement has a vague reference to the "Blue Water management team" owning an interest in Sponsor, Proxy Statement at 49, it does not expressly disclose that Defendants Hernandez, Lerner, Sapirstein, Murphy and McBurney are *owners* of Sponsor. It states that "the Blue Water management team, which owns interests in Sponsor, may have an economic incentive that differs from that of the public stockholders to pursue and consummate the Business Combination rather than to liquidate and to return all of the cash in the trust to the public stockholders." *Id.* But the Proxy Statement never explains which of "the Blue Water management team" owns interests in Sponsor. *See id*. Elsewhere, the Proxy Statement distinguishes between the "Blue Water management team" and the Blue Water board of directors. *See, e.g.*, *id.* at 110 (noting the "experience of Blue Water's management team and Board"). A chart presenting the Pre-Business Combination Beneficial Ownership Table does nothing to resolve this ambiguity. It suggests that all of the Class B Common Stock held by Sponsor is beneficially owned by Hernandez, but a footnote explains that as managing member of Sponsor, Hernandez "may be deemed to have sole voting and investment

discretion with respect to the Class B common stock held by Sponsor." Proxy Statement at 223. That same chart suggests that Defendants Murphy, McBurney, Sapirstein and Lerner have no beneficially owned shares. *See id*.

**Answer:** EGS denies the allegations in Paragraph 144. To the extent that Paragraph 144 refers to the Proxy Statement, EGS refers to that document for its complete and accurate contents.

145. Elsewhere, the Proxy Statement expressly represents that Blue Waters' "board of directors has determined that Messrs. Lerner, Sapirstein and Ms. McBurney and Ms. Murphy are 'independent directors' as defined by Nasdaq listing standards and applicable SEC rules." *Id.* at 143. Thus the Blue Water board of directors represented that these four directors did not have a relationship that "would interfere with the directors independent judgment in carrying out the responsibilities of a director." *Id.*

**Answer:** EGS denies the allegations in Paragraph 145. To the extent that Paragraph 145 refers to the Proxy Statement, EGS refers to that document for its complete and accurate contents.

146. The Proxy Statement fails to disclose the ownership interest in Sponsor (and, therefore, the economic interest in Blue Water Founder Shares) held by each of the Blue Water directors, Defendants Hernandez, Murphy, Sapirstein, Lerner, and McBurney.

**Answer:** EGS denies the allegations in Paragraph 146. To the extent that Paragraph 146 refers to the Proxy Statement, EGS refers to that document for its complete and accurate contents.

147. The Proxy Statement also fails to mention the significant influence over the other directors that Hernandez had at the time. Each of the other Blue Water directors were

obliged to Hernandez for appointment to the Blue Water board, the potentially lucrative grant of ownership interest in Sponsor, and the following, among other things:

a. In February 2021, Hernandez asked each of the other Blue Water directors, Defendants Murphy, Lerner, Sapirstein and McBurney, to be directors of another SPAC, Blue Water Acquisition Corp. II, and each agreed to work with Hernandez on this company they referred to as "**SPAC II**"; and

b. Along with Hernandez, Defendants Murphy and Sapirstein were both directors of another company controlled by Hernandez, Blue Water Vaccines, Inc. ("**Blue Water Vaccines**"). Murphy held a significant number of options to purchase shares in the company.

**Answer:** EGS denies the allegations in Paragraph 147. To the extent that Paragraph 147 refers to the Proxy Statement, EGS refers to that document for its complete and accurate contents.

148. In light of the foregoing, the Proxy Statement's representation that Blue Water directors Sapirstein, Lerner, Murphy, and McBurney were "independent" was, at best, misleading. *See* Proxy Statement at 143.

**Answer:** EGS denies the allegations in Paragraph 148. To the extent that Paragraph 148 refers to the Proxy Statement, EGS refers to that document for its complete and accurate contents.

149. The failure of the Proxy Statement to fully disclose all material facts, including the facts surrounding ownership of Sponsor, is particularly troublesome in this merger where

the Blue Water stockholders were forced to "rely[] solely on the judgment of the Blue Water Board." Proxy Statement at 45.

**Answer:** Paragraph 149 states conclusions of law to which no response is required. To the extent that a response is required, EGS denies the allegations in Paragraph 149. To the extent that Paragraph 149 refers to the Proxy Statement, EGS refers to that document for its complete and accurate contents.

***3. Failure to Disclose Ellenoff's Dual Representation and Contingency Fee***

150. The Proxy Statement does not disclose that Blue Water's counsel, Ellenoff, which authored the Proxy Statement, simultaneously represented Sponsor.

**Answer:** EGS denies the allegations in Paragraph 150, except admits that while EGS represented Blue Water, EGS also represented Sponsor in connection with certain specific matters. To the extent that Paragraph 150 refers to the Proxy Statement, EGS refers to that document for its complete and accurate contents.

151. Nor does the Proxy Statement disclose that Ellenoff had fees that would only be paid upon the closing of the Business Combination. Nor does the Proxy Statement disclose that Ellenoff had a contingent bonus component to its fee.

**Answer:** Paragraph 151 refers to the Proxy Statement, and EGS refers to that document for its complete and accurate contents.

***4. Failure to Disclose the Extensive Relationship Between Hernandez and Maxim Group and Misleading Disclosure of Maxim Group's Fee***

152. Effective as of April 27, 2021, Maxim Group entered into an amendment to the underwriting agreement dated December 15, 2020, in which it agreed to serve as Blue Water's "financial advisor in connection with the proposed Business Combination" in exchange for a

"fee of $250,000, in cash, upon the closing of such Business Combination." Maxim Group Letter dated April 27, 2021, ¶ 2.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 152, and therefore denies same.

153. The Proxy Statement acknowledges Maxim Group's role as underwriter for Blue Water's IPO and that Maxim Group, "is acting as Blue Water's capital markets advisor for the Blue Business Combination." Proxy Statement at 118. The Proxy Statement further discloses that Blue Water's management consulted with Maxim in connection with its evaluation of Clarus, including a review of information on other publicly traded companies in the life sciences and healthcare industries." Proxy Statement at 118-19.

**Answer:** EGS denies the allegations in Paragraph 153, except admits that the Proxy Statement states that Maxim "served as representative to the underwriters in Blue Water's IPO and is acting as Blue Water's capital markets advisor for the Business Combination," and that "Blue Water's management consulted with Maxim in connection with its evaluation of Clarus, including a review of information on other publicly traded companies in the life sciences and healthcare industries". To the extent that Paragraph 153 refers to the Proxy Statement, EGS refers to that document for its complete and accurate contents.

154. The Proxy Statement makes the following representations about Maxim Group's fees:

> a. : "Maxim Group LLC ("Maxim") . . . is entitled to $2,012,500 of deferred compensation for its underwriting services in connection with the Blue Water IPO. Other than disclosed herein, there has been no material relationship between Blue Water or its affiliates and Maxim Group and its affiliates or unaffiliated representatives during the past two years, nor is any such relationship contemplated."
>
> Proxy Statement at 118-19.

b. Later in the Proxy Statement, although it does not mention Maxim Group by name, it notes that the underwriter's fee "will become payable . . . solely in the event that we complete a business combination" Proxy Statement at 149.

**Answer:** EGS denies the allegations in Paragraph 154, except (i) admits the allegations in 154(a), and (ii) admits that the Proxy Statement states that "[t]he deferred fee will become payable to the underwriters from the amounts held in the Trust Account solely in the event that we complete a business combination, subject to the terms of the underwriting agreement". To the extent that Paragraph 154 refers to the Proxy Statement, EGS refers to that document for its complete and accurate contents.

155. Thus Maxim Group effectively had a contingent underwriting fee because Blue Water would only be able to pay the fee if the Business Combination closed and the funds from the IPO were released from the trust.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 155, and therefore denies same.

156. The Proxy Statement omits the additional $250,000 fee payable to Maxim Group for acting as "financial advisor in connection with the proposed Business Combination" pursuant to the April 27, 2021 Agreement described above. That fee was also contingent upon closing of a Business Combination.

**Answer:** EGS lacks knowledge or information sufficient to response to the allegations in Paragraph 156, and therefore denies same. To the extent that Paragraph 156 refers to the Proxy Statement, EGS refers to that document for its complete and accurate contents. To the

extent that Paragraph 156 refers to an April 27, 2021 Agreement between Blue Water and Maxim, EGS refers to that document for its complete and accurate contents.

157. The Proxy Statement also omits the 50,000 shares of Class A Blue Water stock Maxim Group received as part of its compensation for underwriting the Blue Water IPO. As explained in paragraph 84, *supra*, this stock would only have value for Maxim Group if the Business Combination were to close.

**Answer:** EGS denies the allegations in Paragraph 157. To the extent that Paragraph 157 refers to the Proxy Statement, EGS refers to that document for its complete and accurate contents.

158. The contingent nature of Maxim Group compensation described above is particularly problematic in a deal like this one where, as Blue Water's financial advisor, Maxim Group should have advised the directors not to pursue the Business Combination.

**Answer:** EGS denies the allegations in Paragraph 158.

159. The representation in the Proxy Statement that "[o]ther than disclosed herein, there has been no material relationship between Blue Water or its affiliates and Maxim Group and its affiliates or unaffiliated representatives during the past two years, nor is any such relationship contemplated"" is materially misleading. Hernandez had a material relationship with Maxim Group.

**Answer:** EGS denies the allegations in Paragraph 159. To the extent that Paragraph 159 refers to the Proxy Statement, EGS refers to that document for its complete and accurate contents.

160. Hernandez hired Maxim Group to underwrite an IPO for SPAC II on or about February 2, 2021. SPAC II filed a confidential draft registration statement with the SEC on or

about August 8, 2021, and on or about October 18, 2021, SPAC II filed its S-1 registration statement with the SEC. The S-1 discloses that Maxim Group was to serve as the underwriter and as a result, would be paid over $2.5 million in fees based on the Maxim Group/SPAC II agreement dated February 2, 2021.

**Answer:** EGS denies the allegations in Paragraph 160. To the extent that Paragraph 160 refers to a confidential draft registration statement, EGS refers to that document for its complete and accurate contents. To the extent that Paragraph 160 refers to an S-1 registration statement, EGS refers to that document for its complete and accurate contents.

161. Hernandez had also recently engaged Maxim Group to assist another of his companies, Blue Water Vaccines, Inc. with an IPO. On or about June 10, 2021, on behalf of Blue Water Vaccines, Hernandez approved the form of Maxim Group's engagement agreement. On or about August 23, 2021, Blue Water Vaccines filed a confidential draft registration statement with the SEC, and on or about October 10, 2021, Blue Water Vaccines filed its S-1 registration statement with the Securities and Exchange Commission. Both the draft and the final version of the S-1 disclose that Maxim Group serves as the "Sole Book Running Manager."

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 161, and therefore denies same. To the extent that Paragraph 161 refers to a confidential draft registration statement, EGS refers to that document for its complete and accurate contents. To the extent that Paragraph 161 refers to an S-1 registration statement, EGS refers to that document for its complete and accurate contents.

162. Both of these engagements were prior to the Proxy Statement and known to Ellenoff, which was also involved in these engagements, and Hernandez.

**Answer:** EGS denies the allegations in Paragraph 162.

163. Hernandez had an extremely close relationship with Maxim Group as a firm and in particular with Jim Alfaro, who was at that time a Senior Managing Director and Head of Investment Banking at Maxim Group. Hernandez's relationship with Maxim Group and Alfaro was so strong that he wanted to help ensure that their relationship with Blue Water continued after the Business Combination. In recommending Alfaro to Murphy, the incoming chair of the board of Clarus Therapeutics Holdings, Inc. after the deSPAC, Hernandez described him as "our banker," a "friend," an "old neighbor," and "one of the best Wall Street people you will meet."

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 163, and therefore denies same.

164. After the Business Combination, Hernandez continued to communicate behind the scenes on behalf of Maxim Group. For example, when Maxim Group pitched Clarus Therapeutics Holdings, Inc. for an engagement for which Maxim Group was not hired, Alfaro sent an email to Hernandez about it. Moments later, another senior investment banker from Maxim Group emailed certain executives at Clarus Therapeutics Holdings, Inc., including Hernandez, complaining that they did not get hired. Hernandez responded only to the senior investment banker and his friend, Alfaro, stating that he "won't be happy" if "this was a work around." But Hernandez told them that he had been "assured" that the deal had been in the works for some time.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 164, and therefore denies same.

165. Hernandez's advocacy paid off. On March 30, 2022, Hernandez implored that Clarus "move on" his request to hire Maxim Group. Within a month, on April 27, 2022, Clarus Therapeutics Holdings, Inc. filed a Form 8-K disclosing that, on April 25, 2022, it had entered into an underwriting agreement with Maxim Group.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 165, and therefore denies same. To the extent that Paragraph 165 refers to a Form 8-K, EGS refers to that document for its complete and accurate contents.

166. Maxim Group's undisclosed contingent fees and shares and the undisclosed relationship between Maxim Group and Hernandez would all be material to a shareholder in assessing the Business Combination, particularly in light of the Proxy Statement's representation that "Blue Water's management consulted with Maxim in connection with its evaluation of Clarus, including a review of information on other publicly traded companies in the life sciences and healthcare industries." Proxy Statement at 118-19.

**Answer:** EGS denies the allegations in Paragraph 166. To the extent that Paragraph 166 refers to the Proxy Statement, EGS refers to that document for its complete and accurate contents.

### *E. Shareholder Vote and Redemption of Shares*

167. The shareholder vote was originally scheduled for August 12, 2024, but it was postponed at the last minute because of discouraging information regarding the percentage of Blue Water stockholders electing to redeem their shares.

**Answer:** EGS denies the allegations in Paragraph 167, except admits that the shareholders' vote was originally scheduled for August 12, 2024.

168. Initially, almost all (90–95%) of the Blue Water public shares were redeemed. This placed the Business Combination in doubt because it meant that Blue Water would not satisfy a condition of closing. Under the terms of the Merger Agreement, a condition of closing required that Blue Water not have shares redeemed in an amount that would cause it to have net tangible assets of less than $5,000,001 upon consummation of the merger. Merger Agreement § 9.1(d) (attached to the Proxy Statement).

**Answer:** EGS denies the allegations in Paragraph 168.

169. The high redemption rate meant that Clarus would receive little, if any, cash in connection with the Business Combination. Accordingly, Clarus's counsel prepared a termination agreement, sent it to Hernandez for his signature, and prepared to file for bankruptcy.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 169, and therefore denies same.

170. Such redemptions posed a threat to the consummation of the Business Combination putting at risk, among other things, the Founder Shares and placement warrants owned by Sponsor, and in which Hernandez, Murphy, Sapirstein, Lerner, and McBurney held a pecuniary interest, as well as the outstanding, contingent fees of Ellenoff and Maxim Group. As a result, Hernandez requested that Maxim Group and Alfaro work to reverse the redemptions. Accordingly, Maxim Group substantially assisted Blue Water's efforts to convince shareholders to change their decision regarding redemptions and enter into non-redemption agreements.

**Answer:** EGS denies the allegations in Paragraph 170 with respect to EGS, but otherwise lacks knowledge or information sufficient to respond to the allegations in Paragraph 170, and therefore denies same.

171. In addition, Maxim Group was engaged to ensure that Blue Water would have a sufficient number of investors to satisfy NASDAQ listing requirements.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 171, and therefore denies same.

172. These efforts were initially unsuccessful. Maxim Group and Ellenoff were both involved in Hernandez's efforts to "sweeten the deal" with additional warrants and other incentives to convince Blue Water shareholders to reverse their decision to redeem their shares and to encourage investors to buy shares from those who were electing to redeem their shares. These efforts were unsuccessful.

**Answer:** EGS denies the allegations in Paragraph 172.

173. In a call between Clarus leadership and Hernandez on August 25, 2021, the parties were resigned to terminate the Merger Agreement and cancel the Business Combination.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 173, and therefore denies same.

174. In late August 2021, the high number of redemptions created what is termed a "short squeeze" on Blue Water stock. This caused the stock price of Blue Water to spike to over $30 per share. Maxim Group and Hernandez took advantage of this situation to convince certain Blue Water shareholders to reverse their decision to redeem their shares. This meant

that Blue Water would meet the threshold amount of cash from the trust necessary to close the Business Combination. As a result, the Blue Water shareholder meeting was rescheduled.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 174, and therefore denies same.

175. In mid to late August 2021, Clarus had insufficient funds to continue its business, and its board of directors viewed bankruptcy as the company's only option if the Business Combination did not close.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 175, and therefore denies same.

176. Through its close relationship with Hernandez and its involvement in attempts to rescue the Business Combination, Maxim Group and Alfaro learned negative information about Clarus's desperate financial situation. Maxim Group should have informed Blue Water's directors of this negative information. Instead, Maxim Group, Sponsor, and Hernandez continued to perpetuate the informational vacuum around the Blue Water directors and continued to push for a closing even though it was not in the best interests of Blue Water.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 176, and therefore denies same.

177. On August 27, 2021, 70% of the of shares entitled to vote were voted in favor of the Business Combination.

**Answer:** EGS denies the allegations in Paragraph 177.

178. And in connection with that special meeting, 3,270,531 Blue Water shares (56% of the public shares outstanding) were presented for redemption, leaving approximately $25.29 million in trust for the Business Combination.

**<u>Answer:</u>** EGS denies the allegations in Paragraph 178, except admits that 3,270,531 shares were presented for redemption in connection with the special meeting, leaving approximately 25.29 million remaining in the trust account following redemptions.

***F. Blue Water Board Votes to Close on the Business Combination***

179. Although Blue Water now had sufficient cash to close under the Merger Agreement, it was far from the transaction originally contemplated at the time the agreement was executed. After paying fees and expenses associated with the Business Combination, Blue Water provided less than half of the amount of cash initially contemplated. And, as discussed *supra*, no additional funds had been raised though PIPE investment.

**<u>Answer:</u>** EGS denies the allegations in Paragraph 179.

180. Clarus had spent almost all of the additional investment provided by its own stockholders as part of the Business Combination just to make it to the date of closing.

**<u>Answer:</u>** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 180, and therefore denies same.

181. This meant that Clarus had not made the investments upon which its earlier projections had been based.

**<u>Answer:</u>** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 181, and therefore denies same.

182. It also meant that Clarus would not be able to make many of those investments going forward after the closing. In the view of the Clarus board, closing on the Business Combination with Blue Water would simply allow Clarus to go public and live to fight another day.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 182, and therefore denies same.

183. Clarus was on track to suffer a net loss of $40.6 million for FY 2021.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 183, and therefore denies same.

184. Hernandez and Ellenoff sat in several meetings in which Clarus's fragile financial position was discussed and were aware of the facts discussed in paragraphs 179-83 above. Yet, Hernandez urged the Blue Water board to vote to approve of the closing and ratify the acts leading up to the Business Combination. The Blue Water directors unanimously agreed to do so.

**Answer:** EGS denies the allegations in Paragraph 184.

185. The Business Combination closed on September 9, 2021.

**Answer:** EGS admits the allegations in Paragraph 185.

## VII. The Combined Entity Spirals into Bankruptcy

186. Blue Water's post-merger performance confirms the unfairness of the Business Combination for Blue Water.

**Answer:** EGS denies the allegations in Paragraph 186.

187. After the deSPAC transaction, still in dire need of capital, Blue Water, now known as Clarus Therapeutics Holdings, Inc. (referred to herein as "**Holdings**" to indicate post-closing actions of Blue Water) appointed a special committee of independent and disinterested directors to consider a potential strategic transaction (something it did not do in connection with the deSPAC transaction when represented by Ellenoff).

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 187, and therefore denies same.

188. In April 2022, Holdings retained Raymond James as its investment banker. Holdings conducted a $30 million underwritten public offering of Holdings's common stock and accompanying warrants to purchase additional common stock. But even this infusion of funds could not save the company.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 188, and therefore denies same.

189. Holdings continued to lose money. It suffered a net loss of $25.6 million for the six-month period ended June 30, 2022. As of June 30, 2022, the company had an accumulated deficit of $347.2 million. On August 18, 2022, Holdings announced that it would pursue an immediate reduction in staff and terminate certain research and development activities.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 189, and therefore denies same.

190. Holdings filed for Chapter 11 protection in September 2022. In connection with the bankruptcy, Holdings ran an in-court sale process.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 190, and therefore denies same.

191. Through a section 363 sale, Holdings sold JATENZO, its sole commercial asset and only source of revenue, to Tolmar, Inc. The sale price was $7.25 million cash, payment of cure costs, and the payment of contingent royalty payments over a three-year term, based on the net revenue generated from Tolmar's sales of JATENZO. The sale closed on October 27, 2022.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 191, and therefore denies same.

192. A bankruptcy plan establishing a liquidating trust for the pro rata benefit of unsecured creditors has been confirmed. The creditors' trust retained causes of action, including claims regarding the Business Combination:

> The Estates are in the process of reviewing all aspects of this merger transaction, and expressly reserve all Retained Causes of Action against or related to any entity or person that participated in connection with such transactions, including all directors and officers of Clarus, Blue Water and the Merger Sub, any sponsors thereof and any entity or person who received anything of value in Merger Sub, any sponsors thereof and any entity or person who received anything of value in connection with or related to such transactions. Without limitation, such claims may include, but are not limited to, direct, indirect and/or derivative claims for breaches of fiduciary duties, including without limitation the duties of care and loyalty, aiding and abetting such breaches, misrepresentation, fraud, breach of contract, negligence, gross negligence, and unjust enrichment.

**Answer:** EGS denies the allegations in Paragraph 192. To the extent that Paragraph 192 refers to the bankruptcy plan, EGS refers to that document for its complete and accurate contents.

## Causes of Action

193. For each of Counts One, Two, Three and Four, below, Plaintiff seeks redress for harm caused to Blue Water as a result of the breach of duties owed to the company by Defendants Hernandez, Murphy, Lerner, Sapirstein, McBurney, and Sponsor. Although *Multiplan* and *Delman* are cited herein for certain principles of Delaware law, the claims asserted here differ from the claims asserted in those actions in that these claims are brought on behalf of Blue Water for damages caused to the company by breaches of duties owed to the company and the aiding and abetting of such breaches. *Multiplan*, for example, recognizes the viability of such "overpayment claims." See 268 A. 3d 784, 802 ("Overpayment claims allege

that corporate fiduciaries, in breaching their fiduciary duties, caused an exchange of assets or equity at a loss to the corporation"). And *Multiplan* recognizes that such claims are company-owned, not stockholder-owned, claims. Id. at 802 & n. 103.

**Answer:** Paragraph 193 states conclusions of law to which no response is required. To the extent that a response is required, EGS denies the allegations in Paragraph 193.

**COUNT ONE: BREACH OF DUTY BY CONTROLLING SHAREHOLDER AGAINST DEFENDANT BLUE WATER SPONSOR LLC**

194. Plaintiff repeats and realleges the allegations set forth in paragraphs 1–193 above as if set forth in full herein.

**Answer:** EGS incorporates all of its responses to the preceding paragraphs as if fully re-alleged herein. By way of further response, this Count is not applicable to EGS.

***A. Sponsor Is a Controlling Shareholder under Delaware Law***

195. As described in paragraphs 88-93 above, Sponsor exercised actual control over the board and management of Blue Water.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 195 and therefore denies same. By way of further response, this Count is not applicable to EGS.

196. Under Delaware law, Sponsor was a controlling shareholder of Blue Water.

**Answer:** Paragraph 196 states conclusions of law to which no response is required. By way of further response, this Count is not applicable to EGS.

197. The Delaware Chancery Court in *Delman* found that almost identical circumstances to those here established that a SPAC's sponsor is a controlling shareholder prior to closing of the initial acquisition. 288 A.3d at 716. In *Delman*, as with Blue Water, the

sponsor owned approximately 20% of the SPAC's stock, appointed the board, and its *owner* in *Delman* and *managing member* in Blue Water led the search for a target company.

**Answer:** Paragraph 197 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 197. By way of further response, this Count is not applicable to EGS.

198. Sponsor acted through its managing member, Hernandez. Hernandez was also the Chief Executive Officer and Chair of the Blue Water board of directors. He influenced the Blue Water board of directors by, among other things, identifying the acquisition target by himself without involvement of the board; handling all negotiations with Clarus himself with the substantial assistance of Ellenoff, without involvement of other directors; controlling the information that was shared with the board; and advocating for consummation of the Business Combination with Blue Water.

**Answer:** EGS denies the allegations in Paragraph 198. By way of further response, this Count is not applicable to EGS.

***B. Duty of Loyalty and Care***

199. "The duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a . . . controlling shareholder and not shared by the stockholders generally." *In re Orchard Enters., Inc. Stockholder Litig.*, 88 A.3d 1, 33 (Del. Ch. 2014) (internal citations omitted).

**Answer**: Paragraph 199 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 199. By way of further response, this Count is not applicable to EGS.

200. For the reasons, discussed in paragraphs 59-65 above, Sponsor had a conflicting interest that was different from the other shareholders. This conflict caused Sponsor to prefer closing on a bad deal over the possibility of no deal at all. Sponsor would have been left empty handed if Blue Water did not enter into a business combination because under that scenario, the Founder Shares and private placement units would be worthless.

**Answer:** EGS denies the allegations in Paragraph 200. By way of further response, this Count is not applicable to EGS.

201. The duty of care requires fiduciaries to inform themselves, prior to making a business decision, of all material information reasonably available to them. Having become so informed, they must then act with requisite care in the discharge of their duties.

**Answer:** Paragraph 201 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 201. By way of further response, this Count is not applicable to EGS.

202. Sponsor breached its fiduciary duties of loyalty and care as controlling shareholder by prioritizing its own interests over the best interests of Blue Water and causing Blue Water to enter into the Merger Agreement and close on the Business Combination based on its own interests and despite the fact that the transaction was not in Blue Water's best interests.

**Answer:** Paragraph 202 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 202. By way of further response, this Count is not applicable to EGS.

203. Sponsor unfairly imposed its will on Blue Water, acting through its managing member, Hernandez, and with the substantial assistance of Ellenoff and Maxim Group.

Sponsor, among other things, identified the acquisition target and handled all negotiations with Blue Water without involvement of directors other than Hernandez. Further, Sponsor controlled the information that was shared with the board and through Hernandez, to whom other members of the board were beholden, and advocated for consummation of the Business Combination with Blue Water. As a result, Sponsor caused the other directors to evaluate the Business Combination in a rushed and uninformed manner in which they could not consider all of the material information available. Sponsor, motivated to close a Business Combination by its own self-interest, unfairly coerced a result that was not in the best interests of Blue Water.

**Answer:** EGS denies the allegations in Paragraph 203. By way of further response, this Count is not applicable to EGS.

204. As a result of Sponsor's actions, the Blue Water board of directors did not undertake the thorough and careful process their duties to Blue Water required and approved of a business combination that was not in the best interest of Blue Water.

**Answer:** EGS denies the allegations in Paragraph 204. By way of further response, this Count is not applicable to EGS.

### *C. Entire Fairness Standard Applies*

205. Sponsor had a unique interest stemming from its ownership of Founder Shares. This type of unique interest was not shared with the other Blue Water shareholders.

**Answer:** EGS denies the allegations in Paragraph 205. By way of further response, this Count is not applicable to EGS.

206. Because of the controlling influence of Sponsor, which was corrupted by the conflict caused by its unique interest, the Business Combination must be evaluated under the entire fairness standard. And under that standard, the transaction fails.

**Answer:** Paragraph 206 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 206. By way of further response, this Count is not applicable to EGS.

207. Under the entire fairness standard, the defendant fiduciaries will bear the burden "to demonstrate that the challenged act or transaction was entirely fair to the corporation and its stockholders." *Delman*, 288 A.3d at 722 (citation omitted).

**Answer:** Paragraph 207 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 207. By way of further response, this Count is not applicable to EGS.

208. "Although fairness has two component parts—price and process—the court must make a 'single judgment that considers each of these aspects.'" *Id.* (citation omitted).

**Answer:** Paragraph 208 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 208. By way of further response, this Count is not applicable to EGS.

209. First, as to process, the influence of Sponsor unfairly corrupted the entire decision-making process for Blue Water regarding the Business Combination. Sponsor exerted this unfair influence in several ways, including the following:

a. As noted in paragraphs 88-93 & 202-04 above, Sponsor, through its managing member, Defendant Hernandez, controlled the Blue Water board of directors' deliberative process by limiting to Hernandez the

identification of a target, the negotiation of a deal, and the subsequent meetings with Clarus aimed at closing the Business Combination. Sponsor further exerted its control by limiting the information Hernandez and others provided to the board of directors for its consideration.

b. Sponsor exerted control over the Blue Water board's decision-making process by granting an ownership interest to each of the directors. As noted in paragraph 69, above, Sponsor granted an ownership interest to each of Defendants Murphy, Sapirstein, Lerner, and McBurney. This grant ensured that these directors would also share a conflict of interest and incentivized them to vote as Sponsor desired.

c. Further, the material misrepresentations and omissions in the Proxy Statement, noted in paragraphs 143-66, above, prevented the shareholder vote and redemption process from being an adequate check on the actions of a conflicted controlling shareholder and a conflicted board of directors.

**Answer:** Paragraph 209 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 209. By way of further response, this Count is not applicable to EGS. To the extent that Paragraph 209 refers to the Proxy Statement, EGS refers to that document for its complete and accurate contents.

210. As for price, for the approximately $24 million that Blue Water paid Clarus through the reverse merger, Blue Water's stockholders obtained only between 18 to 30% of the shares in the new company.

**Answer:** EGS denies the allegations in Paragraph 210. By way of further response, this Count is not applicable to EGS.

211. Blue Water used all of its cash, approximately $24 million, to buy a minority interest in a struggling company whose accountants expressed substantial concern about its ability to continue as a going concern, which had never turned a profit, and which at the time of closing of the Business Combination was on the brink of bankruptcy. The price paid was unfair.

**Answer:** Paragraph 211 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 211. By way of further response, this Count is not applicable to EGS.

### *D. Damages*

212. As a result of the foregoing, Blue Water was harmed by an interested controlling shareholder placing its own self-interest ahead of Blue Water's best interest.

**Answer:** Paragraph 212 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 212. By way of further response, this Count is not applicable to EGS.

213. Sponsor's breach of loyalty completely corrupted Blue Water's negotiation, agreement, and approval of the Business Combination.

**Answer:** Paragraph 213 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 213. By way of further response, this Count is not applicable to EGS.

214. Blue Water suffered damages in an amount to be proved at trial.

**Answer:** Paragraph 214 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 214. By way of further response, this Count is not applicable to EGS.

215. Plaintiff is entitled to rescissory damages.

**Answer:** Paragraph 215 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 215. By way of further response, this Count is not applicable to EGS.

216. Plaintiff is entitled to such other damages as allowed by law.

**Answer:** Paragraph 216 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 216. By way of further response, this Count is not applicable to EGS.

## COUNT TWO: BREACH OF DUTY BY BLUE WATER DIRECTORS; AGAINST DEFENDANTS Y. JOSEPH HERNANDEZ, KIMBERLY MURPHY, JAMES SAPIRSTEIN, MICHAEL LERNER, AND YVONNE MCBURNEY

217. Plaintiff repeats and realleges the allegations set forth in paragraphs 1–216 above as if set forth in full herein.

**Answer:** EGS incorporates all of its responses to the preceding paragraphs as if fully re-alleged herein. By way of further response, this Count is not applicable to EGS.

218. The Business and affairs of a Delaware corporation are managed by or under direction of its board of directors.

**Answer:** EGS denies the allegations in Paragraph 218. By way of further response, this Count is not applicable to EGS.

219. In exercising these powers, directors are charged with an unyielding fiduciary duty to protect the interests of the corporation and to act in the best interests of its shareholders.

**Answer:** EGS denies the allegations in Paragraph 219. By way of further response, this Count is not applicable to EGS.

220. Defendants Hernandez, Murphy, Sapirstein, Lerner, and McBurney all breached these duties they owed as directors of Blue Water.

**Answer:** Paragraph 220 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 220. By way of further response, this Count is not applicable to EGS.

221. In addition, Defendant Hernandez owed these duties to Blue Water as an officer of the company, and for the same reasons discussed herein, Hernandez breached those duties as well. Hernandez breached those duties in such capacity as well.

**Answer:** Paragraph 221 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 221. By way of further response, this Count is not applicable to EGS.

222. Corporate directors are not permitted to use their position of trust and confidence to further their private interests.

**Answer:** EGS denies the allegations in Paragraph 222. By way of further response, this Count is not applicable to EGS.

223. Delaware law demands of a corporate director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his or her charge, but also to refrain from doing anything that would

work injury to the corporation, or to deprive it of profit or advantage which his or her skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers.

**Answer:** Paragraph 223 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 223. By way of further response, this Count is not applicable to EGS.

224. The rule that requires an undivided and unselfish loyalty to the corporation demands that there be no conflict between duty and self-interest.

**Answer:** Paragraph 224 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 224. By way of further response, this Count is not applicable to EGS.

225. In disclosing that the board did not seek a formal opinion from an unaffiliated third party as to the fair market value of Clarus or the price that Blue Water paid for Clarus, the Proxy Statement concedes: "Blue Water's stockholders will be relying solely on the judgment of the Blue Water Board in determining the value of the Business Combination." Proxy Statement at 45.

**Answer:** EGS denies the allegations in Paragraph 225. By way of further response, this Count is not applicable to EGS. To the extent that Paragraph 225 refers to the Proxy Statement, EGS refers to that document for its complete and accurate contents.

226. The Blue Water board of directors' judgement was clouded. The Blue Water board tacitly admitted its singular focus on consummating a business combination at any cost. Among the reasons listed in the Proxy Statement by the Blue Water board for its recommendation is a statement that Clarus is the best potential business combination

"reasonably available to Blue Water," and that Blue Water had not identified a better alternative. Proxy Statement at 28. Absent from the explanation is consideration of no deal at all, which would clearly be preferable to the Business Combination here. In any event, the decision to close on this Business Combination with Clarus, was made by a conflicted, non-independent board that was advised by counsel and a financial advisor with compelling financial interests to close the deal.

**Answer:** EGS denies the allegations in Paragraph 226. By way of further response, this Count is not applicable to EGS. To the extent that Paragraph 226 refers to the Proxy Statement, EGS refers to that document for its complete and accurate contents.

***A. Directors' Breach of Duty***

227. Directors owe duties of loyalty and due care to the corporation they serve. These duties include a duty of good faith.

**Answer:** Paragraph 227 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 227. By way of further response, this Count is not applicable to EGS.

228. These duties required, *inter alia*, the Blue Water directors to place the interests of Blue Water above their personal interests and the interests of Sponsor.

**Answer:** Paragraph 228 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 228. By way of further response, this Count is not applicable to EGS.

229. Each and every member of the Blue Water board of directors, Defendants Hernandez, Murphy, Sapirstein, Lerner, and McBurney, breached these duties when he or she voted to approve the Merger Agreement and again, when he or she approved the closing of the

Business Combination and ratified all of Hernandez's actions leading up to the closing of the Business Combination as in the best interest of the company.

**Answer:** Paragraph 229 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 229. By way of further response, this Count is not applicable to EGS.

230. "A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders" or "where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders." *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993).

**Answer:** Paragraph 230 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 230. By way of further response, this Count is not applicable to EGS.

231. As alleged in paragraphs 66-73 above, each of the Blue Water directors was conflicted with a material personal financial interest in the consummation of the Business Combination.

a. Hernandez controlled Sponsor as its managing member. And he also had an ownership interest in Sponsor that corresponded to over 1,000,000 Founder Shares of Blue Water stock.

b. Each of the other directors, Defendants Murphy, Sapirstein, Lerner, and McBurney, also had an ownership interest in Sponsor that corresponded to ownership of 10,000 Founder Shares of Blue Water Stock. Therefore, they also had a financial interest in the consummation of the Business Combination through Sponsor.

**Answer:** EGS denies the allegations in Paragraph 231. By way of further response, this Count is not applicable to EGS.

232. Further, the other directors were not independent from Hernandez. As alleged in paragraphs 74 & 147 above, Blue Water directors Murphy, Sapirstein, Lerner, and McBurney were indebted to Hernandez for the appointment to the Blue Water board of directors, and they also relied on Hernandez for additional appointments and assistance. These directors were well aware of Hernandez's significant financial interest in consummating a business combination (even if not in the best interests of Blue Water) and, as a result, their obligations to Hernandez impacted their independence.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 232 and therefore denies same. By way of further response, this Count is not applicable to EGS.

233. The foregoing interests of the Blue Water directors in the consummation of the Business Combination are sufficiently material to find that the directors were not independent.

**Answer:** EGS denies the allegations in Paragraph 233. By way of further response, this Count is not applicable to EGS.

234. The foregoing disloyalty infected all of the Blue Water board of directors' decisions with regard to the Business Combination. There was not an independent majority of the board.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 234 and therefore denies same. By way of further response, this Count is not applicable to EGS.

235. Despite their divided loyalties, the Blue Water directors proceeded to vote on and approve every step of the Business Combination. They failed to appoint an independent board committee to review and vote on the Business Combination, and they failed to engage a neutral third party to provide a formal valuation or fairness determination.

**Answer:** EGS denies the allegations in Paragraph 235. By way of further response, this Count is not applicable to EGS.

236. Through the actions described above, the Blue Water directors breached their fiduciary duties by prioritizing their own personal, financial interests and approving the Business Combination with Clarus, which was unfair to Blue Water.

**Answer:** Paragraph 236 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 236. By way of further response, this Count is not applicable to EGS.

237. Each of the Blue Water board members had a financial interest in ensuring the Business Combination occurred, whether it was a good deal for the company or not.

**Answer:** EGS denies the allegations in Paragraph 237. By way of further response, this Count is not applicable to EGS.

238. Intertwined with their breach of loyalty, the directors also breached their duty of candor by issuing a false and misleading Proxy Statement.

**Answer:** Paragraph 238 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 238. By way of further response, this Count is not applicable to EGS. To the extent Paragraph 238 refers to the Proxy Statement, EGS refers to that document for its complete and accurate contents.

239. By providing inadequate disclosures about the Merger, the Defendants created an unfair process for shareholder approval of the Business Combination and redemptions.

**Answer:** Paragraph 239 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 239. By way of further response, this Count is not applicable to EGS.

240. By failing to address known conflicts of interest—their own and those of fellow directors and the controlling shareholder—and failing to take measures to ensure board decisions would be in the best interest of Blue Water, each of the directors demonstrated a conscious disregard for his or her responsibilities.

**Answer:** Paragraph 240 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 240. By way of further response, this Count is not applicable to EGS.

241. And the decision to close on the Business Combination was not in the best interests of Blue Water. *See* paragraphs 122-24 & 179-184 above. Indeed, by the time of closing, it was obviously contrary to Blue Water's best interests, and that would have been clear to any independent decision-maker.

**Answer:** Paragraph 241 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 241. By way of further response, this Count is not applicable to EGS.

242. Through the actions described above, Defendants Hernandez, Murphy, Sapirstein, Lerner and McBurney breached their duties of loyalty, good faith, and due care.

**Answer:** Paragraph 242 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 242. By way of further response, this Count is not applicable to EGS.

***B. The Directors Are Not Insulated from Liability for Their Breach of Duty***

243. Delaware corporate law does not allow for a waiver of the directors' duty of loyalty. And it does not exempt SPAC mergers from the application of entire fairness review to enforce that obligation.

**Answer:** Paragraph 243 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 243. By way of further response, this Count is not applicable to EGS.

244. Similarly, in the SPAC context in which a shareholder vote is separate from the shareholder's election to redeem shares, a shareholder vote will not cleanse decisions of a conflicted board of directors, even if the conflicts and all other material information were disclosed (which was not the case here).

**Answer:** Paragraph 244 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 244. By way of further response, this Count is not applicable to EGS.

245. The business judgment rule presumption does not protect conduct by directors who have an interest in the challenged conduct or who lack independence from directors who have an interest in challenged conduct. "In such circumstances, a director cannot be expected to exercise his or her independent business judgment without being influenced by the . . . personal consequences resulting from the decision." *Rales,* 634 A.2d at 936. "[T]he law, sensitive to the weakness of human nature and alert to the ever-present inclination to

rationalize as right that which is merely beneficial, will accord scant weight to the subjective judgment of an interested director concerning the fairness of transactions that benefit him." *Merritt v. Colonial Foods, Inc.*, 505 A.2d 757, 765 (Del. Ch. 1986).

**Answer:** Paragraph 245 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 245. By way of further response, this Count is not applicable to EGS.

246. The Delaware Chancery Court has recognized the inherent conflicts of interest of directors with regard to deSPAC mergers. These decisions refuse to give directors the protection of the business judgment rule and instead apply Delaware's most exacting standard of review of director action: the entire fairness test.

**Answer:** Paragraph 246 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 246. By way of further response, this Count is not applicable to EGS.

### *C. The Entire Fairness Standard Applies*

247. Because there were not enough sufficiently informed, disinterested directors who acted in good faith while taking the actions described above to comprise a board majority, the standard of review of director action elevates to entire fairness.

**Answer:** Paragraph 247 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 247. By way of further response, this Count is not applicable to EGS.

248. Under the entire fairness standard, the defendant fiduciaries will bear the burden "to demonstrate that the challenged act or transaction was entirely fair to the corporation and its stockholders." *Delman*, 288 A.3d at 722 (citation omitted). "Although fairness has two

component parts—price and process—the court must make a 'single judgment that considers each of these aspects.'" *Id.*

**<u>Answer:</u>** Paragraph 248 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 248. By way of further response, this Count is not applicable to EGS.

249. First, as to process, the influence of Sponsor over the entire process, during which it rushed the process and limited information provided to directors, the interest of the Blue Water directors, and the failure to fully disclose those interests and other material facts in the Proxy Statement demonstrate a broken process that failed to achieve fairness.

**<u>Answer:</u>** Paragraph 249 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 249. By way of further response, this Count is not applicable to EGS.

250. As for price, for the approximately $24 million that Blue Water paid Clarus through the reverse merger, Blue Water's stockholders obtained only between 18 to 30% of the shares in the new company.

**<u>Answer:</u>** Paragraph 250 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 250. By way of further response, this Count is not applicable to EGS.

251. Blue Water used all of its cash, approximately $24 million, to buy a minority interest in a struggling company whose accountants expressed substantial concern about its ability to continue as a going concern, which had never turned a profit, and which at the time of closing of the Business Combination was on the brink of bankruptcy.

**Answer:** EGS denies the allegations in Paragraph 251. By way of further response, this Count is not applicable to EGS.

252. The price paid was unfair to Blue Water.

**Answer**: Paragraph 252 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 252. By way of further response, this Count is not applicable to EGS.

***D. Damages***

253. As a result, Blue Water was harmed by being deprived of loyal directors who prioritize the company's interest over their own and who fairly and accurately disclose information material to matters for which a shareholder vote is held.

**Answer:** Paragraph 253 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 253. By way of further response, this Count is not applicable to EGS.

254. The directors' breach of duties completely corrupted Blue Water's negotiation, agreement, and approval of the Business Combination causing Blue Water to enter into a transaction that caused harm to Blue Water.

**Answer:** Paragraph 254 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 254. By way of further response, this Count is not applicable to EGS.

255. Blue Water suffered damages in an amount to be proved at trial.

**Answer:** Paragraph 255 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 255. By way of further response, this Count is not applicable to EGS.

256. Plaintiff is entitled to rescissory damages.

**Answer:** Paragraph 256 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 256. By way of further response, this Count is not applicable to EGS.

257. Plaintiff is entitled to such other damages as allowed by law.

**Answer:** Paragraph 257 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 257. By way of further response, this Count is not applicable to EGS.

258. The Blue Water directors, Defendant Hernandez, Lerner, Sapirstein, Murphy, and McBurney are jointly and severally liable for damages arising from the foregoing breaches of duties.

**Answer:** Paragraph 258 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 258. By way of further response, this Count is not applicable to EGS.

**COUNT THREE: AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES: AGAINST DEFENDANT ELLENOFF GROSSMAN & SCHOLE, LLP**

259. Plaintiff repeats and realleges the allegations set forth in paragraphs 1-258 above as if set forth in full herein.

**Answer:** EGS incorporates all of its responses to the preceding paragraphs as if fully re-alleged herein.

260. Plaintiff seeks redress for harm caused to Blue Water as a result of Ellenoff's aiding and abetting the breach of fiduciary duties owed to the company by Sponsor and Defendants Murphy, Sapirstein, Lerner, and McBurney as Blue Water directors, and Hernandez as a director and officer of Blue Water.

**Answer:** Paragraph 260 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 260.

261. Under Delaware law, a defendant is liable for aiding and abetting a breach of fiduciary duty where plaintiff establishes: (1) the existence of a fiduciary relationship; (2) proof that the fiduciary breached its duty; (3) proof that a defendant knowingly participated in a breach; and (4) a showing that damages to the plaintiff resulted from the concerted action of the fiduciary and the non-fiduciary.

**Answer**: Paragraph 261 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 261.

262. As alleged above, alleged above, Sponsor, Hernandez, Murphy, Lerner, Sapirstein, and McBurney each owed fiduciary duties of loyalty, due care, and good faith to Blue Water. The duty of loyalty mandates that the best interest of the corporation takes precedence over the self interest of a fiduciary. The duty of care requires fiduciaries to inform themselves, prior to making a business decision, of all material information reasonably available to them. Having become so informed, they must then act with requisite care in the discharge of their duties. And the duty of good faith is breached when a fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation.

**Answer:** Paragraph 262 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 262.

263. Sponsor Hernandez, Murphy, Lerner, Sapirstein, and McBurney each breached their duties owed to Blue Water.

**Answer:** Paragraph 263 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 263.

264. Ellenoff, as counsel for Blue Water occupied a position of trust with the Blue Water board and its officers. Among other things, Blue Water directors looked to Ellenoff for guidance on their legal responsibilities as board members.

**Answer:** EGS denies the allegations in Paragraph 264.

265. Ellenoff lawyers attended all meetings of the Blue Water board. In addition, an Ellenoff lawyer acted as secretary of the Blue Water Board of Directors' Meetings on at least the following dates: January 27, 2021, July 16, 2021, August 16, 2021, August 25, 2021, and August 26, 2021. By serving as officers of Blue Water, Ellenoff lawyers were "insiders" of Blue Water. See 11 U.S.C. § 101(31)(B)(ii).

**Answer:** Paragraph 265 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 265.

266. Ellenoff, as counsel for Sponsor, occupied a position of trust with it. As a result, Ellenoff was aware of the Sponsor's ownership of Founder Shares in Blue Water and the financial incentive that created. Ellenoff was also aware of ownership interests held in Sponsor. Indeed, Ellenoff drafted the February 11, 2021 Securities Transfer Agreements that conveyed ownership interests in Sponsor to Defendants Murphy, Lerner, Sapirstein, and McBurney.

**Answer:** EGS denies the allegations in Paragraph 266, except EGS admits that it was aware that Sponsor owned shares of Blue Water's Class B common stock and EGS was aware of the securities transfer agreements.

267. Ellenoff acted with the knowledge that the conduct of Sponsor and the Blue Water directors constituted such a breach. Among other things, Ellenoff:

a. Served as counsel to both Blue Water and Sponsor;

b. Drafted and participated in the negotiations concerning all of the documents and agreements and Board approvals relating to the formation of Blue Water and the Business Combination;

c. Drafted the Securities Transfer Agreements conveying an ownership interest in Sponsor to Directors Murphy, Lerner, Sapirstein, and McBurney, dated February 11, 2021;

d. Participated in Blue Water board of directors meetings; and

e. Participated in meetings with Clarus in which issues relating to the Business Combination were discussed, including warning signs such as the failure to attract PIPE investment and negative feedback received from potential investors, Clarus's need for additional cash prior to the closing of the Business Combination to continue operations, and Clarus's tenuous financial condition.

**Answer:** EGS denies the allegations in Paragraph 267.

268. Ellenoff materially participated in Hernandez and Sponsor's conflicted discharge of their fiduciary duties. Among other things described in this Complaint, Ellenoff, knowing the financial incentive for Sponsor to approve any deal, even a bad deal, and knowing that Clarus was in a precarious financial condition, substantially assisted Sponsor (via Hernandez) and Hernandez in pushing for a closing the Business Combination.

**Answer:** EGS denies the allegations in Paragraph 268.

269. Ellenoff materially participated in the Blue Water directors' conflicted discharge of their fiduciary duties.

**Answer:** EGS denies the allegations in Paragraph 269.

270. Further, Ellenoff participated in the decisions of Sponsor and the Blue Water directors and substantially assisted Hernandez in causing the Blue Water board of directors to make the decisions at issue and close on the Business Combination.

**Answer:** EGS denies the allegations in Paragraph 270.

271. Ellenoff knew that the conduct of Sponsor and Blue Water directors constituted a breach of duty and gave substantial assistance and encouragement to the directors to breach their duties.

**Answer:** EGS denies the allegations in Paragraph 271.

272. As a result of the breaches of fiduciary duties alleged above, and Ellenoff's aiding and abetting those breaches, Blue Water was harmed by having a controlling shareholder impose its will on the company for the benefit of the controlling shareholder and to the detriment of the best interests of Blue Water.

**Answer:** EGS denies the allegations in Paragraph 272.

273. As a result of the breaches of fiduciary duties alleged above, and Ellenoff's aiding and abetting those breaches, Blue Water was harmed by being deprived of loyal directors who prioritize the company's interest over their own and who fairly and accurately disclose information material to matters for which a shareholder vote is held; Blue Water was further harmed by the failure of due care of Sponsor, Hernandez, Murphy, Lerner, Sapirstein, and McBurney in closing on the Business Combination with Clarus.

**Answer:** EGS denies the allegations in Paragraph 273.

274. The foregoing breaches of fiduciary duties, and Ellenoff's aiding and abetting those breaches, completely corrupted Blue Water's negotiation, agreement, and approval of the Business Combination.

**Answer:** EGS denies the allegations in Paragraph 274.

275. Blue Water suffered damages in an amount to be proved at trial.

**Answer:** Paragraph 275 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 275.

276. Plaintiff is entitled to rescissory damages.

**Answer:** Paragraph 276 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 276.

277. Plaintiff is entitled to such other damages as allowed by law.

**Answer:** Paragraph 277 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 277.

278. Ellenoff is jointly and severally liable with Sponsor, the Blue Water directors, and Maxim Group for damages arising from the foregoing breaches of duties.

**Answer:** EGS denies the allegations in Paragraph 278.

**COUNT FOUR: AIDING AND ABETTING BREACH OF FIDUICARY DUTIES: AGAINST DEFENDANT MAXIM GROUP, LLC**

279. Plaintiff repeats and realleges the allegations set forth in paragraphs 1–258 above as if set forth in full herein.

**Answer:** EGS incorporates all of its responses to the preceding paragraphs as if fully re-alleged herein. By way of further response, this Count is not applicable to EGS.

280. Plaintiff seeks redress for harm caused to Blue Water as a result of Maxim Group's aiding and abetting the breach of duties owed to the company by Sponsor and Defendants Murphy, Sapirstein, Lerner, and McBurney as Blue Water directors, and Hernandez as a director and officer of Blue Water.

**Answer:** Paragraph 280 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 280. By way of further response, this Count is not applicable to EGS.

281. Under Delaware law, a defendant is liable for aiding and abetting a breach of fiduciary duty where plaintiff establishes: (1) the existence of a fiduciary relationship; (2) proof that the fiduciary breached its duty; (3) proof that a defendant knowingly participated in a breach; and (4) a showing that damages to the plaintiff resulted from the concerted action of the fiduciary and the non-fiduciary.

**Answer:** Paragraph 281 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 281. By way of further response, this Count is not applicable to EGS.

282. As alleged above, Sponsor, Hernandez, Murphy, Lerner, Sapirstein, and McBurney each owed fiduciary duties of loyalty, due care, and good faith to Blue Water. The duty of loyalty mandates that the best interest of the corporation takes precedence over the self interest of a fiduciary. The duty of care requires fiduciaries to inform themselves, prior to making a business decision, of all material information reasonably available to them. Having become so informed, they must then act with requisite care in the discharge of their duties. And the duty of good faith is breached when a fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation

**Answer:** Paragraph 282 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 282. By way of further response, this Count is not applicable to EGS.

283. Sponsor and the Blue Water directors and Hernandez as an officer breached their duties owed to Blue Water.

**Answer:** Paragraph 283 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 283. By way of further response, this Count is not applicable to EGS.

284. Because of its close relationship with Hernandez and role as financial advisor to Blue Water regarding the Business Combination, Maxim Group acted with the knowledge that the conduct of Sponsor and the Blue Water directors constitutes such a breach.

**Answer:** Paragraph 284 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 284. By way of further response, this Count is not applicable to EGS.

285. Further, Maxim Group participated in the decisions of Sponsor and the Blue Water directors. Maxim Group, as financial advisor for the Business Combination and as the Blue Water advisor with whom management consulted regarding its evaluation of Clarus, occupied a position of trust with Sponsor, the Blue Water board, and its officers.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 285 and therefore denies same. By way of further response, this Count is not applicable to EGS.

286. Maxim Group materially participated in Hernandez and Sponsor's conflicted discharge of their fiduciary duties while serving as financial advisor and consulting with Hernandez and management on their evaluation of Clarus. Hernandez discussed Clarus's financials with Maxim Group as early as January 7, 2021. And Blue Water engaged Maxim Group to serve as its financial advisor in connection with the Business Combination.

**Answer:** Paragraph 286 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 286. By way of further response, this Count is not applicable to EGS.

287. Further, Maxim Group was involved in the board's deliberations. Maxim provided industry comparables to Hernandez for him to present to the Board in support of his valuation of Clarus. Those comparables were used to justify valuation of Clarus and the price that Blue Water would pay for a minority interest in the combined company. Director McBurney testified that the Board relied on valuation information prepared for and provided to the Board in determining Clarus's value. But Maxim Group did not provide material information regarding the poor financial condition of Clarus, particularly on the eve of closing, to the full board of directors. This created an information vacuum that allowed Hernandez to push the Business Combination to closing.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 287 and therefore denies same. By way of further response, this Count is not applicable to EGS.

288. Maxim Group knew that the conduct of Sponsor Hernandez, Murphy, Lerner, Sapirstein, and McBurney constituted a breach of duty and gave substantial assistance and encouragement to Sponsor, Hernandez, Murphy, Lerner, Sapirstein, and McBurney to breach their duties.

**Answer:** Paragraph 288 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 288. By way of further response, this Count is not applicable to EGS.

289. As a result of breaches of fiduciary duties alleged above, and Maxim Group's aiding and abetting those breaches, Blue Water was harmed by having a controlling shareholder impose its will on the company for the benefit of the controlling shareholder and to the detriment of the best interests of Blue Water.

**Answer:** Paragraph 289 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 289. By way of further response, this Count is not applicable to EGS.

290. As a result of the breaches of fiduciary duties alleged above, and Maxim Group's aiding and abetting those breaches, Blue Water was harmed by being deprived of loyal directors who prioritize the company's interest over their own and who fairly and accurately disclose information material to matters for which a shareholder vote is held; Blue Water was further harmed by the failure of due care of Sponsor, Hernandez, Murphy, Lerner, Sapirstein, and McBurney in closing on the Business Combination with Clarus.

**Answer:** Paragraph 290 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 290. By way of further response, this Count is not applicable to EGS.

291. The foregoing breaches of fiduciary duties, and Maxim Group's aiding and abetting those breaches, completely corrupted Blue Water's negotiation, agreement, and approval of the Business Combination.

**Answer:** Paragraph 291 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 291. By way of further response, this Count is not applicable to EGS.

292. Blue Water suffered damages in an amount to be proved at trial.

**Answer:** Paragraph 292 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 292. By way of further response, this Count is not applicable to EGS.

293. Plaintiff is entitled to rescissory damages.

**Answer:** Paragraph 293 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 293. By way of further response, this Count is not applicable to EGS.

294. Plaintiff is entitled to such other damages as allowed by law.

**Answer:** Paragraph 294 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 294. By way of further response, this Count is not applicable to EGS.

295. Maxim Group is jointly and severally liable with Sponsor, the Blue Water directors, and Ellenoff for damages arising from the foregoing breaches of duties.

**Answer:** Paragraph 295 states conclusions of law to which no response is required. To the extent a response is required, EGS denies the allegations in Paragraph 295. By way of further response, this Count is not applicable to EGS.

**COUNT FIVE: OBJECTION TO THE PROOF OF CLAIM OF KIMBERLY MURPHY**

296. Plaintiff repeats and realleges the allegations set forth in paragraphs 1-258 above as if set forth in full herein.

**Answer:** EGS incorporates all of its responses to the preceding paragraphs as if fully re-alleged herein. By way of further response, this Count is not applicable to EGS.

297. Kimberly Murphy filed a proof of claim asserting an "unliquidated" claim based on purported "Contractual and Statutory Indemnity Rights as a Director of Clarus Therapeutics Holdings, Inc." against Clarus Therapeutics Holdings, Inc. Claim No. 41.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 297 and therefore denies same. By way of further response, this Count is not applicable to EGS.

298. Nowhere in the proof, however, does it state the basis for her purported "contractual" indemnity rights. As such, this objection will address Murphy's purported statutory indemnity rights as a director.

**Answer:** EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 298 and therefore denies same. By way of further response, this Count is not applicable to EGS.

299. Under Delaware law, to the extent that a director is sued based on a company-owned claim, as Murphy is here, the director is entitled to indemnification if, and only if, among other things, such director, "acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation." 8 Del. C. § 145(b).

**Answer:** Paragraph 299 states conclusions of law to which no response is required. To the extent a response is required, EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 299 and therefore denies same. By way of further response, this Count is not applicable to EGS.

300. As alleged above, Murphy neither "acted in good faith" or "in a manner" she "reasonably believed to be in or not opposed to the best interests of" Clarus Therapeutics Holdings, Inc.

**Answer:** Paragraph 300 states conclusions of law to which no response is required. To the extent a response is required, EGS lacks knowledge or information sufficient to respond to the allegations in Paragraph 300 and therefore denies same. By way of further response, this Count is not applicable to EGS.

301. Accordingly, given that Murphy is not entitled to indemnification under Delaware law, her claim should be disallowed pursuant to 11 U.S.C. § 502(b)(1).

**Answer:** Paragraph 301 states conclusions of law to which no response is required. To the extent a response is required, EGS lack sufficient information to justify a belief as to the truth of the allegations in Paragraph 301 and therefore denies same. By way of further response, this Count is not applicable to EGS.

## GENERAL DENIAL

1. EGS denies any averment not specifically admitted herein.
2. EGS generally denies liability on all claims asserted by the Plaintiff.

## DEFENSES

1. Plaintiff fails to state a claim upon which relief can be granted.
2. The claims alleged are barred by the applicable statute of limitations and/or laches.
3. Blue Water has not sustained any damages compensable as a result of any act or omission of EGS.
4. Plaintiff's claims are barred by the doctrine of *in pari delicto*.
5. Plaintiff's claims are barred by the doctrine of unclean hands.
6. Plaintiff's claims are barred by the doctrines of res judicata and/or collateral estoppel.
7. To the extent damages are available, Blue Water has not suffered any damages, or its damages are speculative and impossible to ascertain and were not caused proximately or in fact by any act or omission of EGS.

8. EGS raises each and every defense (at law, in equity, or otherwise) available under any and all federal and state statutes, laws, including common law, rules and regulations.

9. The First Amended Complaint does not describe the claims made against EGS with sufficient particularity to allow EGS to determine all of EGS' defenses, and it therefore lacks sufficient knowledge to form a belief as to the existence and availability of additional defenses.

10. EGS reserves the right to assert additional defenses as discovery progresses and the facts are ascertained to support such additional defenses.

11. No legal or equitable basis exists to grant Plaintiff's request for relief in the form of interest, costs, expenses and attorneys' fees.

WHEREFORE, EGS respectfully requests that all of the claims asserted in the First Amended Complaint be dismissed with prejudice at Plaintiff's cost and for such other relief as the Court may deem just and appropriate.

Dated: February 27, 2026

**ELLENOFF GROSSMAN & SCHOLE LLP**
John B. Horgan
1345 Avenue of the Americas, 11th Fl
New York, New York 10105
Telephone: (212) 370-1300
jbhorgan@egsllp.com

*and*

**ASHBY & GEDDES, P.A.**
*/s/ Benjamin W. Keenan*_____
Ricardo Palacio (DE No. #3765)
Benjamin W. Keenan (DE No. #4724)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
Telephone: 302-654-1888
bkeenan@ashbygeddes.com

*Attorneys for Defendant EGS*